IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEFFREY M. DAVIS, Jr.,

                            Plaintiff,                          OPINION AND ORDER

          v.                                       12-cv-559-wmc

CINDY HARDING, *et al*.,

                            Defendants.

---

State inmate Jeffrey M. Davis, Jr., is very likely mentally ill, surely both intelligent *and* unquestionably intent on using stunning acts of self-harm as a means to get what he wants, a combination that must be among the most challenging for any penal institution. His escalating acts of self-harm are almost certainly fueled by the reaction (negative or positive) that he receives, not only on an intellectual level but in a psychological one. This civil action pursuant to 42 U.S.C. § 1983, concerns efforts to treat Davis's underlying long-standing maladaptive behavior and the conditions of his confinement at the Wisconsin Resource Center.   In particular, Davis claims that the defendants employed there failed to protect him from swallowing dangerous items -- including fingernail clippers, a pen, a AA battery, a razor blade, disinfectant solution and hoarded medications -- and denied him access to prompt medical care following one such instance.  After the defendants filed a motion for summary judgment, the court granted Davis's request for assistance in recruiting *pro bono* counsel.   Since then, the parties have conducted extensive discovery on Davis's claims and the defendants have filed an amended summary-judgment motion.   (Dkt. # 214).

1

After considering all of the parties' briefing, the exhibits and the applicable law, defendants' amended motion for summary judgment is denied with respect to the following claims:   (1) whether defendant Derek Stoinski acted with deliberate indifference on January 5, 2012, in failing to take reasonable measures to prevent Davis from engaging in self-harm; (2) whether defendant Cindy Harding acted with deliberate indifference on or about February 23, 2012, in failing to take reasonable measures to prevent Davis from stockpiling over-the-counter medication; (3) whether defendants Michael Drake and Anthony Gassen acted with deliberate indifference on February 29 through March 1, 2012, in failing to take reasonable measures to prevent Davis from engaging in self-harm; and (4) whether Dr. Jasmine Rutherford committed medical malpractice on January 5, 2012, in failing to assess Davis's risk of self-harm or suicide under the prison suicide prevention policy.   Defendants' motion for summary judgment is granted with respect to all other claims and defendants for reasons set forth below.

Sadly, allowing Davis to proceed with these claims likely provides further reinforcement for his maladaptive acts of self-harm, perversely thwarting the very treatment Davis needs and making more difficult DOC's profoundly challenging task of keeping Davis, other inmates and themselves safe during his confinement.[1]   At the same time, the court has no choice but to permit a trial where defendants' actions may be

---

[1] As Davis's most recent proposed lawsuit illustrates, this challenge is ongoing.  *See Davis v. Meisner*, No. 14-cv-278-wmc.   In this new case, Davis sues approximately 55 defendants stemming from the conditions of his subsequent confinement at the Columbia Correctional Institution.   Among other things, he alleges that they failed to protect him from swallowing foreign objects (including his eyeglasses, pens, his toothbrush, and a plastic cereal bowl),

reasonably found to constitute deliberate indifference to a known risk that Davis will commit self-harm. Although it seems unlikely a jury will actually reach this holding, hopefully calling certain of these defendants to account at trial is a valuable reminder of the need to confront, rather than deliberately ignore, the dangers confronting even our nation's most frustrating, mentally ill inmates and the need to find more effective ways to safely house and treat them.

BACKGROUND

Davis is a 30-year-old prisoner with a diagnosis of borderline personality disorder and a lengthy history of maladaptive behavior in the institutional or correctional setting, where he has spent more than half of his troubled life. Davis is presently incarcerated at the Columbia Correctional Institution ("CCI") in Portage. At all times relevant to the complaint, however, Davis was confined at the Wisconsin Resource Center ("WRC"), which is a secure treatment facility located in Winnebago.

The incidents giving rise to the complaint occurred while Davis was receiving mental health treatment at the WRC, which is run by the Wisconsin Department of Health Services ("DHS"). All of the defendants are employed at WRC by DHS or the Wisconsin Department of Corrections ("DOC"). Defendant Cindy Harding is an institution unit supervisor. Dr. Jasmine Rutherford is a psychologist or psychological associate who treated Davis. Cindy Weiland, Donna Miller and Michael Priebe are psychiatric care supervisors. Jennifer Lemke, Derek Stoinski, Doris Dehn, Kally Rockow,

---

overdosing on hoarded medication, cutting himself or hanging himself on fourteen different

Elizabeth Barker, Michael Robl and Kevin Kaufmann are psychiatric care technicians. Theodore Stern is a security captain. Michael Drake and Anthony Gassen are correctional officers.

As outlined more fully below, Davis has been allowed to proceed with claims arising out of several, specific instances in which he inflicted harm on himself by swallowing foreign objects or ingesting excess amounts of over-the-counter medication while in custody at WRC. In each instance, Davis maintains that defendants ignored his threats of self-harm and failed to protect him from himself. Davis also claims that he was denied prompt medical care following one instance of self-harm. The specific allegations against each defendant are as follows:

1. On January 5, 2012, Rutherford and Stoinski ignored Davis's threats of self-harm and other signs of his intent to commit suicide.

2. During February 2012, Rockow, Barker, Stoinski, Dehn and Lemke gave Davis over-the-counter medication, but failed to observe him ingest the pills and allowed him to hoard or stockpile an excess amount that he later used to overdose. Defendant Harding was advised of this problem on or about February 23, but failed to take action as their supervisor.

3. On February 23, 2012, Harding, Dehn, Miller and Rutherford ignored Davis's threat that he was going to commit suicide.

occasions.

4

4. In the early morning hours of February 28, 2012, Stern failed to immediately transport Davis to the hospital following an overdose of over-the-counter medication.

5. On February 29, 2012, Robl and Kaufmann failed to take reasonable measures when Davis threatened to engage in self-harm.

6. On the evening of February 29 and the early morning hours of March 1, 2012, Drake and Gassen failed to take reasonable measures to prevent Davis from engaging in self-harm.

7. On May 2, 2012, Priebe and Weiland failed to take reasonable measures to prevent Davis from engaging in self-harm.

The court has granted Davis leave to proceed with allegations that these defendants were deliberately indifferent to his serious mental health needs in violation of the Eighth Amendment and were negligent under state law.[2]  (Dkt. # 9.)  Before addressing each specific instance of self-harm, the court considers some background information about WRC and an overview of Davis's mental health treatment.

---

[2] For the first time in his response to defendants' summary-judgment motion, Davis contends that Dr. Rutherford is liable for failing to take reasonable measures to prevent him from engaging in self-harm on February 27, 2012.  (Dkt. # 229, Plaintiff's Br. in Response at 27-28.)  Davis's complaint makes no mention of this allegation and he was not granted leave to proceed with this claim.  (*See* Dkts. # 1, # 9.)  Defendants object to plaintiff's attempt to add a new claim in this manner.  (Dkt. # 236, Defendants' Reply Br. at 10.)  The court notes that trial is less than two months away.  To the extent that plaintiff seeks leave to amend his complaint at this late date, the request is denied. *See Thompson v. Ill. Dept. of Prof'l Regulation*, 300 F.3d 750, 759 (7th Cir. 2002) ("It is well within the province of the district court to deny leave to amend if, among other

WISCONSIN RESOURCE CENTER

WRC is a specialized mental health facility that was established as a prison pursuant to Wisconsin Statute § 46.056.   According to its director, Bryan Bartow, WRC's guiding principle is to engage and treat individuals with severe and persistent mental health needs within a secure setting to enhance public safety, promote healing, and support personal recovery.[3]   As such, the facility operates as a secure treatment center and is managed by the DHS, Division of Mental Health and Substance Abuse Services.[4]

DOC inmates are frequently referred to WRC for treatment of behavioral and/or mental health issues.[5]   Davis was transferred from a maximum security prison (CCI) to WRC for mental health treatment in mid-November 2011.   During the time period relevant to the complaint, Davis was assigned to the A-1 unit, which is for "maximum custody inmates" who are "high functioning individuals."[6]   Harding was the institution unit supervisor or IUS in charge of the A-1 unit, where Davis was assigned.[7]   As Harding explains, inmates are typically referred to WRC "because the sending institution believes

---

things, there is undue delay or undue prejudice would result to the opposing party if the amendment were allowed.")
[3] (Dkt. # 74, Bartow Aff., ¶ 6.)
[4] (Dkt. # 74, Bartow Aff., ¶ 4.)
[5] (Dkt. # 74, Bartow Aff., ¶ 5.)
[6] (Dkt. # 193, Harding Dep. at 8:23-24 (noting that WRC has 18 units, but that only 14 are currently filled with inmates); 9:15-17.)
[7] (Dkt. # 193, Harding Dep. at 9:15.)

that the inmate has mental health issues or some type of acting out behavior that they are not able to manage in the correctional facility."[8]

WRC inmates have considerable freedom of movement when compared to those in DOC maximum security institutions.   Whereas inmates at a maximum security prison are locked into their cells most of the time, there are many hours throughout the day when WRC inmates are not locked into their cells.[9]   Inmates at WRC spend most of their time on open units with staff and a comparatively small number of other prisoners.[10]   In that respect, the staff-to-inmate ratio at WRC is much higher than a maximum security prison unit.[11]   At WRC, inmates are in regular daily contact with many different staff members, including an assigned unit social worker, an assigned unit psychological associate, psychiatric care supervisors and unit psychiatric care technicians ("PCTs").[12] Correctional officers are also employed at WRC to maintain security and to help monitor the therapeutic environment.[13]

Several of the defendants in this case (Lemke, Stoinski, Dehn, Rockow, Barker, Robl and Kaufmann) are PCTs.   PCTs are not trained in the provision of medical treatment.[14]   Rather, they monitor the inmates' behavior and interact with them as an appropriate role model to promote the development of functional daily living and social

---

[8]  (Dkt. # 193, Harding Dep. at 14:15-19.)
[9]  (Dkt. # 194, Harding Dep. at 89:17-23.)
[10]  (Dkt. # 194, Harding Dep. at 89:21-25.)
[11]  (Dkt. # 194, Harding Dep. at 89:21-25.)
[12]   (Dkt. # 194, Harding Dep. at 89:9-90:22.)
[13]  (Dkt. # 190, Drake Dep. at 10-12.)
[14]  (Dkt. # 94, Harding Decl., ¶ 7.)

skills and to facilitate positive behavioral changes.[15]   PCTs discuss observations and concerns about inmates with staff in professional disciplines, focusing on problems and successes in the application of the Treatment Learning Plan ("TLP") specific to each inmate.[16]   PCTs also maintain the safety and security of the institution.[17]

In addition to its staff-to-inmate ratio, the creation of programs to control and modify behavior has enabled WRC to place difficult-to-manage inmates on general population units.[18] Program segregation and disciplinary committee procedures have been customized to coordinate the control, discipline, and treatment functions of the institution.[19] Inmates may also be placed in "observation status," which is a non-punitive status used for the purpose of preventing an inmate from inflicting harm upon himself or someone else.[20]

Depending on the risk of harm, inmates in observation may be monitored intermittently every 15 minutes or they may be subject to "close" supervision every five minutes if they are believed to be at "significant risk for self-harm[.]"[21]   Close supervision may be warranted where an inmate expresses suicidal thoughts or feelings or has a "recent history of suicidal or self-harm behavior."[22]   Inmates at a "high risk for imminent suicidal

---

[15]  (Dkt. # 94, Harding Decl., ¶ 7; Dkt. # 195, Lemke Dep. at 5:3.)
[16]  (Dkt. # 94, Harding Decl., ¶ 7; Dkt. # 194, Harding Dep. at 72:25-73:4.)
[17]  (Dkt. # 94, Harding Decl., ¶ 7; Dkt. # 195, Lemke Dep. at 5:10.)
[18]  (Dkt. # 74, Bartow Aff., ¶ 5.)
[19]  (Dkt. # 74, Bartow Aff., ¶ 5.)
[20]  (Dkt. # 101, Rutherford Decl., ¶ 7; Dkt. # 193, Harding Dep. at 16:2-6; Dkt. # 194, Harding Dep. at 83:18-22.)
[21]  (Dkt. # 227, DOC Division of Adult Institutions ("DAI") Policy # 311.00.01 at 6; Dkt. # 101, Rutherford Decl., ¶ 7; Dkt. # 194, Harding Dep. at 80:24-81:1.)
[22]  (Dkt. # 227, DOC Division of Adult Institutions ("DAI") Policy # 311.00.01 at 6.)

8

behavior" may be subject to "constant monitoring."[23] Upon the authorization of a
security supervisor or recommendation of psychiatric services staff, an inmate who is
actively engaging in self-harm or who poses an immediate threat of injury to himself or
others may also be placed in mechanical restraints.[24]  No matter what their position, any
staff member at WRC can initiate the process of having an inmate transferred to
observation or contact someone with the authority to do so.[25]  Once in observation, the
level of supervision (intermittent, close or constant) must be authorized by a psychologist,
physician or warden.[26]

## OVERVIEW OF DAVIS'S MENTAL HEALTH TREATMENT

When Davis arrived at WRC in November 2011, he had a diagnosis of borderline
personality disorder, among other things. [27] Borderline personality disorder is
characterized by "[a] pervasive pattern of instability of interpersonal relationships,
self-image, and affects, and marked impulsivity beginning in early adulthood and present
in a variety of contexts, as indicated by five (or more) of the following:  (1) [f]rantic
efforts to avoid real or imagined abandonment[;] (2) [a] pattern of unstable and intense
interpersonal relationships characterized by alternating between extremes of idealization

---

[23] (Dkt. # 227, DOC Division of Adult Institutions ("DAI") Policy # 311.00.01 at 6; Dkt. #
101, Rutherford Decl., ¶ 7; Dkt. # 194, Harding Dep. at 80:24-81:1.)
[24] (Dkt. # 199, Weiland Dep. at 33:11-15, 36:10-12; Dkt. # 227, DAI Policy # 311.00.01 at 9.)
[25] (Dkt. # 220, Rutherford Dep. at 45:8-47:8; Dkt. # 227, DAI Policy # 311.00.01 at 6 ("Any
staff member or inmate may recommend that an inmate be placed in clinical observation.").)
[26] (Dkt. # 199, Weiland Dep. at 26:1-9; Dkt. # 227, DAI Policy # 311.00.01 at 6.)

and devaluation[;] (3) [i]dentity disturbance: markedly and persistently unstable self-image or sense of self[;] (4) [i]mpulsivity in at least two areas that are potentially self-damaging (*e.g.*, spending, sex, substance abuse, reckless driving, binge eating)[;] (5) [r]ecurrent suicidal behavior, gestures, threats, or self-mutilating behavior[;] (6) [a]ffective instability due to a marked reactivity of mood (*e.g.*, intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days)[;] (7) [c]hronic feelings of emptiness[;] (8) [i]nappropriate, intense anger or difficulty controlling anger (*e.g.*, frequent displays of temper, constant anger, recurrent physical fights)[;] (9) [t]ransient, stress-related paranoid ideation or severe dissociative symptoms[.]"[28]

According to defendants' expert, Dr. Edward Dow, Davis has a history of intractable behavior grounded primarily in a profound breakdown of normal personality dynamics resulting in what has been described as self-injurious behavior — mainly through ingestion of foreign objects.[29]  Davis concedes that he has a lengthy history of self-harm by swallowing foreign objects and engaging in other detrimental or maladaptive behavior. [30]  Davis was transferred to WRC because he (1) demonstrated poor interpersonal effectiveness skills; (2) engaged in power struggles with staff; (3) exhibited poor emotional regulation and distress tolerance skills; (4) engaged in hunger strikes; and

---

[27] (Dkt. # 225, DeClercq Decl., Exh. A (Dec. 22, 2011 TLP) at 1) (noting that Davis was diagnosed with an Axis I mood disorder, along with alcohol and cannabis abuse, and an Axis II diagnosis of personality disorder NOS with narcissistic antisocial and borderline features).)

[28] (Dkt. # 188, Report of Dr. Teresa E. Woods, at 6.)

[29] (Dkt. # 213, Dr. Dow Report, at 3.)

[30] (Dkt. # 122, Davis Aff. at ¶ 17.)

(5) repeatedly threatened to harm himself.[31]   Davis reportedly had thoughts of self-harm every day during the time he was assigned to WRC.[32]

While at WRC, Davis was under the treatment of medical services staff and psychological services staff, who were responsible for his mental health treatment.   This treatment consisted of therapy and acute psychological services.   Dr. Rutherford was the psychologist primarily responsible for Davis's overall mental health care while he was assigned to unit A-1 at WRC.[33]   Another psychologist, Dr. Autumn Dante (who is not a defendant here), was assigned to provide Davis with individualized therapy in February 2012.[34]   In addition, Davis interacted frequently with PCTs, who were responsible for monitoring his behavior on the unit.

At a staffing meeting on December 22, 2011, attended by Davis and WRC personnel, including defendants Harding, Stoinski and Rutherford, Davis's diagnosis of borderline personality disorder was noted.[35]   At that time, his symptoms were described as sadness, trouble sleeping, thoughts of self-harm and suicide, a history of aggression, poor interpersonal skills, conflict with authority and a "low frustration tolerance" that caused Davis to become "easily agitated."[36]   Davis admitted that his poor interpersonal skills had led to "verbal aggressiveness" towards staff, explaining that he was easily

---

[31] (Dkt. # 1-3, Compl. at 5, ¶ 2.)
[32] (Dkt. # 94, Harding Decl., ¶ 8; Dkt. # 185, Davis Dep. at 109:12-15.)
[33] (Dkt. # 220, Rutherford Dep., at 15:19; 17:15-22, 61:24-62:4.)
[34] (Dkt. # 220, Rutherford Dep., at 61:21-23.)
[35] (Dkt. # 225, DeClercq Decl., Exh. A (December 22, 2011 TLP) at 1.)
[36] (Dkt. # 225, DeClercq Decl., Exh. A (December 22, 2011 TLP) at 1.)

angered by communication that he perceived as "disrespectful."[37]   According to the TLP in place on December 22, Davis was participating in a "Stress Management" program and he was scheduled to take part in a "Life Support Group" as well as a "Painting and Drawing" program.[38]   He was also receiving tutoring in math and reading.[39]

Davis was informed of the importance of letting staff know if he was feeling that he could act on thoughts of self-harm, and was encouraged by staff to communicate these thoughts promptly.[40]   Davis took the opportunity to communicate these thoughts of self-harm on a frequent basis and often became upset if a particular psychiatric professional, such as Dr. Rutherford or Dr. Dante, could not meet with him immediately.[41]   Dr. Rutherford observed that, over the course of his treatment at WRC, Davis displayed a pattern of willful, manipulative behavior.[42]   For example, Davis utilized threats, including threats of self-harm, to demand desired responses from staff on a frequent basis.[43]   Davis also used threats of self-harm to avoid being issued conduct reports.[44]   On numerous occasions, Davis was placed in observation status at WRC.[45]

---

[37] (Dkt. # 225, DeClercq Decl., Exh. A (December 22, 2011 TLP) at 2.)
[38] (Dkt. # 225, DeClercq Decl., Exh. A (December 22, 2011 TLP) at 2.)
[39] (Dkt. # 225, DeClercq Decl., Exh. A (December 22, 2011 TLP) at 2.)
[40] (Dkt. # 101, Rutherford Decl., ¶ 6 & Exh. B (Treatment Notes) at 6.)
[41] (Dkt. # 101, Rutherford Decl., ¶ 6; Dkt. # 194, Harding Dep. at 77:24-78:14.)
[42] (Dkt. # 220, Rutherford Dep. at 76:10-78:3.)
[43] (Dkt. # 101, Rutherford Decl., ¶ 8 & Exh. B (Treatment Notes)at 11, 14, 15, 18, 19, 24, 28, 46; Dkt. # 94, Harding Decl, ¶  13; Dkt. # 89, Dante Decl., ¶  4.)
[44] (Dkt. # 101, Rutherford Decl., ¶ Exh. B (Treatment Notes) at 14 &18.)
[45] (Dkt. # 101, Rutherford Decl., ¶ 7; Dkt. # 94, Harding Decl., ¶ 10.)

Davis acknowledges that his behavior is motivated by a need to get his needs met by any means, including self-harm.[46]  Davis's maladaptive behavior posed a challenge to his treating providers, as well as to staff at WRC, creating what the defendants describe as a "defeating therapeutic spiral."[47]  According to Dr. Dow, staff response to Davis's threats of self-harm inadvertently reinforced the effectiveness of such threats in the future.[48]  Defendants contend that Davis's tendency to use self-harm and threats of suicide or self-harm to get his needs met placed staff in a proverbial "catch-22" situation and frustrated the goals of his treatment regimen.[49]

The primary purpose of Davis's WRC referral was to address the issues of his borderline personality disorder and to develop more effective interpersonal communication skills, as well as distress/coping skills through the use of a Dialectic Behavior Therapy treatment plan.[50]  Dialectic Behavior Therapy or DBT is described in the professional body of research as appropriate for personality disorders and has been found to be effective with borderline features.[51]

At the core of DBT is the operant behavioral principle of reinforcement.[52]  According to Dr. Dow, the technical concept of reinforcement is rather specific and can be

---

[46] (Dkt. # 122, Davis Aff., ¶¶ 71-73; Dkt. # 223, Woods Rebuttal, at 3; Dkt. # 220, Rutherford Dep., at 76:17-22.)

[47] (Dkt. # 213, Dr. Dow Report, at 3.)

[48] (Dkt. # 213, Dr. Dow Report, at 3.)

[49] (Dkt. # 216, Defendants' Br. at 1.)  In this context, a "catch-22" is "[a] situation in which a desired outcome or solution is impossible to attain because of a set of inherently illogical rules or conditions." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 292 (2000).

[50] (Dkt. # 212, Dr. Dow Report at 5.)

[51] (Dkt. # 212, Dr. Dow Report at 6.)

[52] (Dkt. # 212, Dr. Dow Report at 6.)

understood as anything that increases the likelihood that a behavior will be repeated.[53] Although this may seem quite straight forward, Dr. Dow notes the dilemma that the person whose behavior needs modification actually defines the reinforcers.[54] Maladaptive behavior is thought to arise because of a "warped reinforcement history."[55] DBT attempts to break the cycle that reinforces maladaptive behavior, which sometimes causes a "spike" in the type of maladaptive behavior sought to be changed.[56]   As Dr. Dow explains, when a person attempts to use behavior that has been effective in the past but gets little or no response, the individual may repeat the behavior for a brief period of time with more energy and exhibit it multiple times.[57]   The patient must come to realize that the previous maladaptive behavior no longer works before other more effective behavior can be implemented.[58] This, at least in theory, is how DBT works.

According to the December 22, 2011, TLP, Davis was scheduled to begin DBT treatment at the start of the next semester.[59]   In the interim, Davis was treated by Dr. Rutherford, who was the unit psychologist for all of the inmates assigned to the A-1 unit. Dr. Rutherford was aware that Davis had self-harmed in the past, although it had been three years since he had acted on any of those thoughts.[60] Based upon her initial meeting with him and her review of his file in December 2011, Rutherford considered Davis a

---

[53]  (Dkt. # 212, Dr. Dow Report at 6.)
[54]  (Dkt. # 212, Dr. Dow Report at 6.)
[55]  (Dkt. # 212, Dr. Dow Report at 6.)
[56]  (Dkt. # 212, Dr. Dow Report at 6.)
[57]  (Dkt. # 212, Dr. Dow Report at 6.)
[58]  (Dkt. # 212, Dr. Dow Report at 6.)
[59]  (Dkt. # 101, Rutherford Decl., Exh. A (February 23, 2012 TLP) at 2.)
[60]  (Dkt. # 220, Rutherford Dep., at 55:9.)

14

"potential risk" for self-harm or suicide.[61]   Davis threatened to harm himself on December 12, 2011, and Dr. Rutherford worked with him to refrain from self-harm.[62] Despite her efforts, Davis escalated beyond threats of self-harm to actual self-harm in early January 2012.   As outlined below, Davis also engaged in self-harm in February and May 2012.

SELF-HARM ON JANUARY 5, 2012

On or about January 2, 2012, Davis submitted a Health Service Request ("HSR") to a WRC staff member who is not a defendant here.   Davis expressed frustration that the pain medicine he was given by the Health Services Unit ("HSU") was inadequate to treat his complaints of back pain.   Although an x-ray of his back showed normal results, Davis demanded an MRI and physical therapy.   The HSR stated: "If nothing is done about my back pain by January 8, 2012, I will commit suicide."[63]   The WRC staff member contacted Davis, determined that there was no immediate risk of harm and forwarded the HSR to the HSU.[64] The HSU contacted Dr. Rutherford regarding Davis's statement of suicidal intent.[65]

On January 3, 2012, Dr. Rutherford met with Davis to discuss his thoughts of self-harm and memorialized their conversation with a Treatment Management ("TxM")

---

[61] (Dkt. # 220, Rutherford Dep., at 56:16-25.)
[62] (Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at 3.)
[63] (Dkt. # 1, Compl. at 7, ¶ 14.)
[64] (Dkt. # 1, Compl. at 7, ¶¶ 15-16.)

note.[66]   During that meeting, Dr. Rutherford noted that Davis was "highly upset" with what he deemed to be inadequate treatment by HSU and that he responded by stopping any medication prescribed for him, including his Lithium.[67]   Dr. Rutherford and Davis discussed several aspects of Davis's thought process, including his attempt to force HSU to treat him, his dismissal of the work HSU had done, the short time frame he gave HSU to continue working with him, the effect committing suicide would have on his children, his desire for treatment to reduce self-harm or suicide attempts, the potential consequences of stopping medication, and alternative coping methods.[68]   Davis reportedly responded that he did not care and maintained his position that he would kill himself on January 8th because "that's more than enough time for HSU to respond."[69]

Dr. Rutherford noted that Davis did not appear to be a danger to himself at the time of their January 3 meeting, but that the danger may increase as the weekend of January 8 approached.[70]   Dr. Rutherford told Davis that staff would continue to check in with him and that observation placement was likely if staff believed he was becoming a danger to himself.[71]   Rutherford noted that Davis had a history of saying he will harm himself in order to get staff to respond quickly to his requests.[72]

[65] (Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at 7.)
[66] (Dkt. # 101, Rutherford Decl., ¶ 10 & Exh. B (Treatment Notes), at 7-8.)
[67] (Dkt. # 101, Rutherford Decl., ¶ 10 & Exh. B (Treatment Notes), at 8.)
[68] (Dkt. # 101, Rutherford Decl., ¶ 11 & Exh. B (Treatment Notes), at 8.)
[69] (Dkt. # 101, Rutherford Decl., ¶ 12 & Exh. B (Treatment Notes), at 8.)
[70] (Dkt. # 101, Rutherford Decl., ¶ 13 & Exh. B (Treatment Notes), at 8.)
[71] (Dkt. # 101, Rutherford Decl., ¶ 14 & Exh. B (Treatment Notes), at 8.)
[72] (Dkt. # 101, Rutherford Decl., ¶ 15 & Exh. B (Treatment Notes), at 8.)

On January 4, 2012, Rutherford sent an email to the treatment team and others (including psychiatrist Dr. J. Alba, psychiatrist Dr. T. Michlowski, Nursing Supervisor M. Hart, and Clinical Director Dr. S. Curran, none of whom are defendants here).[73]   The January 4 e-mail informed them of the threat Davis had made to end his life on January 8 if HSU did not provide him with the treatment he demanded.[74]   In the January 4 e-mail, Rutherford noted that Davis did not appear to be a present danger to himself, but that he could possibly become a danger as the weekend of January 8 moved closer.[75] In the January 4 e-mail, Rutherford outlined a plan to monitor Davis and stated that observation placement was likely if staff believed he was becoming a danger to himself.[76]

At the same time, Rutherford noted in the e-mail:

> Mr. Davis has a history of threatening suicide and not following through with any attempt. Since his admission to WRC, he has used this several times in an effort to manipulate staff into meeting his needs. However, I do not want to overlook the possibility that he could be serious. I am not suggesting that HSU comply to every request that he has but I am suggesting that we be observant of his demeanor and behavior in the upcoming days to determine his need for obs placement. He stated that he will cooperate with PSU decision for obs placement but that will not stop him from killing himself once he "says all the right things" and is returned to the unit.[77]

Thus, Rutherford raised the need for general awareness to determine whether Davis was at risk for self-harm or in need of potential placement in observation.

---

[73] (Dkt. # 101, Rutherford Decl., ¶ 16 & Exh. C (E-mails).)
[74] (Dkt. # 101, Rutherford Decl., ¶ 16 & Exh. C (E-mails).)
[75] (Dkt. # 101, Rutherford Decl., ¶ 17 & Exh. C (E-mails).)
[76] (Dkt. # 101, Rutherford Decl., ¶ 17 & Exh. C (E-mails).)
[77] (Dkt. # 101, Rutherford Decl., ¶ 17 & Exh. C (E-mails).)

On January 5, 2012, Davis alleges that he awoke feeling hopeless and suicidal.[78] Davis went to the PCT desk in the front of the dayroom and submitted a Psychological Services Request ("PSR") to PCT Stoinski.   The PSR simply stated that Davis was having "suicidal thoughts" and indicated that Davis "would like to see psychology staff."[79] Davis alleges that Stoinski read the PSR, but did not inquire further at that time.[80] When Stoinski received the PSR, he called Dr. Rutherford at her office.[81]   Shortly thereafter, Dr. Rutherford arrived at the unit for another scheduled appointment.   Stoinski promptly gave the PSR to Dr. Rutherford.[82]

The parties dispute what happened next.   Davis alleges that he had "no conversation" with Rutherford after he submitted the PSR.[83]   Rutherford contends that she informed Davis that she would meet with him immediately after a scheduled meeting with another client and that Davis said "OK" and walked away.[84]

What is not disputed is that Davis was allowed to walk away and return to his room where he was unsupervised with the possible exception of a "census" round conducted by PCT Lemke. [85]   During this time, PCTs Stoinski and Lemke were

---

[78] (Dkt. # 1, Compl. at 7 ¶ 17.)
[79] (Dkt. # 225, DeClercq Decl., Exh. B (Psychological Services Request).)
[80] (Dkt. # 1, Compl. at pg. 7 ¶¶ 22-23.)
[81] (Dkt. # 198, Stoinski Dep. at 16:23-24.)
[82] (Dkt. # 105, Stoinski Decl., ¶ 8; Dkt. # 101, Rutherford Decl., ¶ 18.)
[83] (Dkt. # 119, Resp. to DPFOF ¶ 48 (citing Davis Aff., ¶¶ 18-19); Dkt. # 195, Lemke Dep. at 18:5-25).)
[84] (Dkt. # 101, Rutherford Decl., ¶ 18; Dkt. # 105, Stoinski Decl., ¶ 8; Dkt. # 220, Rutherford Dep. at 99:17, 100:8; *see also* Dkt. # 1, Compl. at 7 ¶¶ 18-19.)
[85] (Dkt. # 195, Lemke Dep. at 25:1-12.)

monitoring some 25 to 30 other inmates as well.[86]   It is also undisputed that Davis later returned to the PCT desk and asked to check out his fingernail and toenail clippers.[87] Stoinski gave Davis the fingernail and toenail clippers, which are considered potentially hazardous items, and recorded the transaction in the "Sharps Checkout log."[88]   Davis then returned to his room and began packing his belongings.[89]   At some point, Davis went back to the PCT desk and received disinfectant cleaning solution.[90]

While Davis concedes that Stoinski also asked him to place these belongings into the unit storage room,[91] the parties dispute what was said between them during this portion of their encounter. Davis claims he "told Stoinski that he wanted his property placed in storage for his family because he would be 'D.O.A.' [dead on arrival] and would not need it where he was going."[92]   Stoinski claims that (a) Davis said he was "going to prison"; (b) Stoinski asked Davis "[w]hat do you mean 'going to prison'? You are already in prison"; (c) Davis stated he was going to a segregation unit; and (d) Stoinski believed that Davis meant segregation when Davis stated that he was "going to prison."[93]   In any event, Stoinski agreed to move the belongings to the storage room.[94]

---

[86] (Dkt. # 198, Stoinski Dep. at 25:19-20; Dkt. # 195, Lemke Dep. at 5:25, 9:19. 12:14-17.)
[87] (Dkt. # 105, Stoinski Decl., ¶ 9 & Ex. A at pg. 1; Dkt. # 1, Compl. at 8, ¶ 28.)
[88] (Dkt. # 198, Stoinski Dep. at 26:23-28:25; Dkt. # 225, DeClercq Decl., Exh. C (Sharps Checkout).)
[89] (Dkt. # 105, Stoinski Decl., ¶ 10 & Exh. A at pg. 1.)
[90] (Dkt. # 105, Stoinski Decl., Exh. A at pg. 1; Dkt. # 1, Compl. at 9, ¶ 42.)
[91] (Dkt. # 105, Stoinski Decl., ¶ 10, Exh. A at pg. 1; Dkt. # 1, Compl. at 8, ¶ 30.)
[92] (Dkt. # 119, Resp. to DPFOF ¶ 62 (citing Davis Aff., ¶¶ 24, Ex. E).)
[93] (Dkt. # 105, Stoinski Decl., ¶ 11.)
[94] (Dkt. # 105, Stoinski Decl., ¶ 10 & Exh. A at 1.)

During this conversation, Stoinski also asked Davis if he was still using the nail clippers.[95] The parties again dispute what was said next.  Stoinski claims that Davis stated that he was still using the nail clippers.[96]  Davis claims that:  "he told Stoinski that he had not yet eaten his clippers," that "Stoinski laughed at this statement," and then replied, "Don't eat them, you could die and they probably don't taste very good without hot sauce."[97]

Shortly after Davis asked Stoinski to place his belongings into the storage room, another inmate reported to Stoinski that Davis was in the bathroom "swallowing stuff."[98] Stoinski went to speak with Davis, who then reported that he had swallowed his room key along with the fingernail clippers and attempted to swallow his toenail clippers.[99] Stoinski then witnessed Davis drink some of the disinfectant solution,[100] finish it and throw the empty container in the trash can.[101]

Davis claims that he was then told to face the wall and placed in handcuffs.[102] Stoinski reportedly told Davis to go to his room.[103] Stoinski then made sure that the door was secured and summoned a supervisor to report to the unit.[104]   The HSU was

---

[95] (Dkt. # 105, Stoinski Decl., ¶ 11.)
[96] (Dkt. # 105, Stoinski Decl., ¶ 11.)
[97] (Dkt. # 119, Resp. to DPFOF ¶ 66 (citing Davis Aff., ¶ 26; Second RFA, p. 41, ¶¶ 181-182).)
[98] (Dkt. # 105, Stoinski Decl., ¶ 12 & Ex. A at 2; Dkt. # 198, Stoinski Dep. at 36:21, 38:5-11)
[99] (Dkt. # 105, Stoinski Decl., ¶ 13 & Exh. A at 2.)
[100] (Dkt. # 105, Stoinski Decl., ¶ 13 & Exh. A at 2.)
[101] (Dkt. # 105, Stoinski Decl., ¶ 14.)
[102] (Dkt. # 122, Davis Aff., ¶ 167.)
[103] (Dkt. # 105, Stoinski Decl., ¶ 14.)
[104] (Dkt. # 105, Stoinski Decl., ¶ 14.)

contacted for assessment and treatment.[105] Davis was transferred to unit F-11, which is a

higher security observation unit.[106] Davis then went to the local hospital, where he

underwent a gastroenterological endoscopy to remove the items that he swallowed.[107]

After Davis returned to WRC from the hospital, he was placed in unit H-11 on

observation status to prevent him from further harming himself.[108] Rutherford

interviewed Davis upon his return from the hospital and the TxM notes of their

encounter are as follows:

> Mr. Davis presented as much more calm and relaxed than he did on the
> previous day. He stated that he no longer felt suicidal because he "got it out
> of my system." He stated that while the objects were being removed, he
> began to have a different perspective. Mr. Davis expressed that he was being
> impulsive and irrational in his actions. He further expressed that he should
> not use threats or actual self-harm as a means of getting his needs met. He
> also explained that he should have more patience, use more coping
> resources, and consider the consequences before he reacts. This clinician
> reminded Mr. Davis of the frequency of his self-harm threats, previously
> stating that he would self-harm on January 8, 2012, as well as him
> previously informing this clinician that he would "say the right things" to be
> removed from obs status so he would have another opportunity to attempt
> suicide. He became upset when told he would remain in obs status but was
> encouraged to use this as an opportunity to display safe behaviors and
> effective coping . . . . Intent to harm himself was difficult to discern because
> even though he denied it currently, Mr. Davis has made several statements
> recently indicating wanting to die and also revealed that he knew what to
> say to be removed from obs status so he would have another opportunity to
> kill himself.[109]

---

[105] (Dkt. # 105, Stoinski Decl., ¶ 15.)

[106] (Dkt. # 105, Stoinski Decl., ¶ 16; Dkt. # 1, Compl. at 9-10, ¶¶ 47-49.)

[107] (Dkt. # 1, Compl. at pg. 10 ¶ 51.)

[108] (Dkt. # 101, Rutherford Decl., ¶ 20; Dkt. # 1, Compl. at 10, ¶ 54.)

[109] (Dkt. # 101, Rutherford Decl., ¶ 20 & Exh. B (Treatment Notes) at 10.)

Eventually, Davis was released from observation and returned to unit A-1.  He started participating in a group DBT program shortly thereafter on January 24, 2012.[110]

## FEBRUARY 2012

In February 2012, Dr. Autumn Dante was assigned to provide Davis with individual therapy in DBT.[111]  At that time, Dr. Dante became Davis's primary mental health provider, acting as his "DBT coach."[112]

On February 21, 2012, Davis submitted an HSR requesting a back brace and an appointment with a specialist, threatening that he "would not live" with back pain past March 1, 2012.[113]  Staff in the HSU interpreted the comment as a veiled threat of suicide if he did not get his needs met by March 1, and forwarded Davis's comments to Dr. Rutherford, who alerted Dr. Dante and the rest of Davis's treatment team.[114]

On February 23, 2012, Davis asked a social worker "[h]ow do I let you all know who I want to have my things when I die."[115]  The social worker responded that he would probably need to write his wishes down or complete a formal legal document, such as a will, but she wasn't certain.[116] Later that same day, Davis asked Harding about writing a will.  When Harding questioned him about why he was writing a will, Davis told Harding

---

[110]  (Dkt. # 101, Rutherford Decl., ¶ 27 & Exh. A (February 23, 2012 TLP) at 5.)
[111]  (Dkt. # 220, Rutherford Dep. at 17:15-18:23.)
[112]  (Dkt. # 220, Rutherford Dep. at 18:19-23, 120:6-25.)
[113]  (Dkt. # 225, DeClercq Decl., Exh. I (E-mail exchange).)
[114]  (Dkt. # 225, DeClercq Decl., Exh. I (E-mail exchange).)
[115]  (Dkt. # 93, Hans Decl., ¶¶15-16.)
[116]  (Dkt. # 93, Hans Decl., ¶¶ 15-16; Dkt. # 94, Harding Decl., Exh. A at 1-2.)

that he was "not planning on dying, but ha[d] a feeling he might."[117]   Harding questioned Davis about whether he was feeling suicidal and he responded that he had "no plan to die soon."[118]  Harding alerted his treatment team by e-mailing Dr. Dante, Dr. Rutherford and Davis's assigned social worker (Alicia Hans).[119] After documenting Davis's statements, Harding noted that "we need to be aware and reconsider next week before [March 1]. He says this stuff all the time."[120]

Later on February 23, 2012, Davis attended a staffing meeting with his treatment team, including: Dr. Rutherford; Harding; Dehn and Miller.  The meeting was also attended by Dr. Dante and several other staff members (a teacher, a senior therapist, a social worker and another staff member) who are not defendants in this case.[121] The purpose of the meeting was to update Davis's TLP based on his current needs.[122]

During the February 23 staffing meeting, it was noted that Davis threatened self-harm when he felt desperate to get his needs met.[123] It was also noted that Davis had engaged in self-harming behavior for the first time in three years on January 5, because it

---

[117] (Dkt. # 94, Harding Decl., ¶ 22 & Exh. A at 2; Dkt. # 101, Rutherford Decl., Exh. B at 18.)
[118] (Dkt. # 94, Harding Decl., ¶ 22; Dkt. # 101, Rutherford Decl., Exh. B (Treatment Note) at 18.)
[119] (Dkt. # 94, Harding Decl., ¶ 22 & Exh. A at 2.)
[120] (Dkt. # 94, Harding Decl., ¶ 22 & Exh. A at 2.)
[121] (Dkt. # 101, Rutherford Decl., Exh. A (February 23, 2012 TLP) at 1; Dkt. # 93, Hans Decl., ¶ 8; Dkt. # 94, Harding Decl., ¶ 14; Dkt. # 89, Dante Decl., ¶ 5; Dkt. # 90, Dehn Decl., ¶ 6; Dkt. # 98, Miller Decl., ¶ 5.)
[122] (Dkt. # 101, Rutherford Decl., Exh. A (February 23, 2012 TLP) at 1; Dkt. # 93, Hans Decl., ¶ 9; Dkt. # 94, Harding Decl., ¶ 15; Dkt. # 89, Dante Decl., ¶ 6; Dkt. # 98, Miller Decl., ¶ 6.)
[123] (Dkt. # 101, Rutherford Decl., ¶ 23 & Ex. A (February 23, 2012 TLP) at 1; Dkt. # 93, Hans Decl., ¶ 10; Dkt. # 94, Harding Decl., ¶ 16; Dkt. # 89, Dante Decl., ¶ 7; Dkt. # 90, Dehn Decl., ¶ 7; Dkt. # 98, Miller Decl., ¶ 7.)

was Davis's perception that WRC staff did not immediately meet his needs.[124] It was further noted that Davis planned to commit suicide on March 1, if HSU did not respond to his back pain.[125]

Davis told the staff members that the WRC environment was a "trigger" for him. Specifically, Davis explained that, with all of the resources available at WRC, he had a lot of expectations and when those expectations were not met, frustration triggered his threats of self-harm.[126] WRC staff discussed the option of taking Davis out of DBT when the "core mindfulness" component of that program was done and returning him to DOC custody since Davis identified the DOC as a less triggering environment.[127] It was decided that if Davis's behavior of threats and acts of self-harm continued, the treatment team would further explore a transfer back to DOC.[128]

---

[124] (Dkt. # 101, Rutherford Decl., ¶ 23 & Exh. A (February 23, 2012 TLP) at 1; Dkt. # 93, Hans Decl., ¶ 10; Dkt. # 94, Harding Decl., ¶ 16; Dkt. # 89, Dante Decl., ¶ 7; Dkt. # 90, Dehn Decl., ¶ 7; Dkt. # 98, Miller Decl., ¶ 7.)

[125] (Dkt. # 101, Rutherford Decl., ¶ 24 & Ex. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans Decl., ¶ 10; Dkt. # 94, Harding Decl., ¶ 16; Dkt. # 89, Dante Decl., ¶ 8; Dkt. # 90, Dehn Decl., ¶ 7; Dkt. # 98, Miller Decl., ¶ 7.)

[126] (Dkt. # 101, Rutherford Decl., ¶ 25 & Exh. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans Decl., ¶ 11; Dkt. # 94, Harding Decl., ¶ 17; Dkt. # 89, Dante Decl., ¶ 9; Dkt. # 98, Miller Decl., ¶ 8.)

[127] (Dkt. # 101, Rutherford Decl., ¶ 26 & Exh. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans Decl., ¶ 12; Dkt. # 94, Harding Decl., ¶ 18; Dkt. # 89, Dante Decl., ¶ 10; Dkt. # 98, Miller Decl., ¶ 9.)

[128] (Dkt. # 101, Rutherford Decl., ¶ 26 & Exh. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans Decl., ¶ 12; Dkt. # 94, Harding Decl., ¶ 18; Dkt. # 89, Dante Decl., ¶ 10; Dkt. # 98, Miller Decl., ¶ 9.)

One of the several goals identified in the February 23 staffing meeting was to "eliminate self-harm and threats of self-harm as a means of getting needs met."[129] In order to meet that goal, the following intervention activities were listed:

- Davis would continue his participation in the DBT program to improve his distress tolerance and emotional regulation;
- Staff would react to Davis's threats without affect, but would respond to ensure safety;
- Segregation placement would potentially be granted if Davis's threats or requests warranted it for safety; and
- Davis would be reviewed for observation status if segregation placement was requested or necessary, and review property restrictions when a segregation placement happened.[130]

The treatment team further planned to continue monitoring Davis, documenting his statements in regards to thoughts of self-harm and encouraging him to utilize the coping skills he was learning in DBT.[131]

## SELF-HARM ON FEBRUARY 27 & 28, 2012

Davis continued to receive DBT treatment with Dr. Dante, who used that opportunity to confront Davis with his threats of self-harm and other maladaptive

---

[129] (Dkt. # 101, Rutherford Decl., ¶ 27 & Exh. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans Decl., ¶ 13; Dkt. # 94, Harding Decl., ¶ 19; Dkt. # 89, Dante Decl., ¶ 11; Dkt. # 98, Miller Decl., ¶ 10.)

[130] (Dkt. # 101, Rutherford Decl., ¶ 27 & Exh. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans Decl., ¶ 13; Dkt. # 94, Harding Decl., ¶ 19; Dkt. # 89, Dante Decl., ¶ 11; Dehn Decl., ¶ 8; Dkt. # 98, Miller Decl., ¶ 10.)

[131] (Dkt. # 101, Rutherford Decl., Exh. B (Treatment Note) at 19.)

behavior.[132]   On February 24, 2012, Dr. Dante entered TxM notes of her recent

encounters with Davis:

> Inmate Davis was staffed today. This writer has met with inmate Davis
> several times this week. Inmate Davis has put in several ultimatums to
> HSU. He reports that he will commit suicide if he is not given certain
> treatment for his back pain. This writer has had discussion with him about
> these ultimatums. He states that he really does not want to die, but gets
> very desperate to have people listen to him. We talked about using DBT
> skills to get his needs met, rather than threats. He verbalizes insight into his
> negative behavior; however feels helpless when it comes to reacting in an
> effective manner. This writer talked to him about how he would "tutor"
> someone into solving the problems that he has. He states that he would tell
> them to focus on their goals. He then outlined his goals and stated that he
> would be ok. Today he showed this writer a necklace he is making for his
> daughter and said he was feeling much better. Inmate Davis denies any
> current thoughts or intentions of suicide.[133]

Several days later, at around 3:00 p.m. on February 27, Davis entered into a verbal

argument with a staff member and received a conduct report for his behavior. Without

communicating his thoughts or actions to anyone, Davis swallowed a segregation pen and

a rock around this point in time.[134] At Davis's request, Dr. Dante was then called to see

Davis for skill coaching.[135]   From approximately 4:00 p.m. to 4:30 p.m. on February 27,

Dante met with Davis.

Dante's notes of that encounter state as follows:

---

[132] (Dkt. # 101, Rutherford Decl., ¶ 27 & Exh. A (February 23, 2012 TLP) at 2; Dkt. # 93, Hans
Decl., ¶ 13; Dkt. # 94, Harding Decl., ¶ 19; Dkt. # 89, Dante Decl., ¶ 11; Dehn Decl., ¶ 8; Dkt.
# 98, Miller Decl., ¶ 10.)
[133] (Dkt. # 89, Dante Decl., ¶ 13 & Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at
19.)
[134] (Dkt. # 1-3, Compl. at pg. 13 ¶ 78; Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes)
at 20.)
[135] (Dkt. # 89, Dante Decl., ¶ 14 & Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at
20.)

Inmate Davis explained that he is having a difficult day and described a conduct report that he will be receiving. He appropriately expressed his emotion about the conduct report and with this writer used wise mind to find a good way to handle the situation. Inmate Davis stated that he would talk to the staff member writing the ticket and to the IUS about how he can resolve the conflict he is having with the staff member. This writer praised him for coming up with a very effective way to handle the issue that was causing him intense emotions. Inmate Davis then stated that he knew it was not rational[] to talk about hurting himself or suicide over the situations that are presented to him. He stated that he had no[] intention to harm himself and verbalized an ability to recognize his goals. This writer asked inmate Davis if he needed to be put into observation or if he needed a time out in segregation to stay safe and he said "no, I am good."

Assessment:
Inmate Davis presented in a calm manner. His thought process was organized and rational[]. He was able to verbalize DBT skills and worked through wise mind appropriately. Inmate Davis denies intentions of self harm or suicide.[136]

During this encounter, Davis did not disclose to Dr. Dante that he had recently swallowed, or was planning to swallow additional any foreign objects.[137]

At midnight on February 28, 2012, Davis awoke to a "trouble call" alarm in the unit for another inmate who had attempted to hang himself.  Davis contends that this incident made him feel suicidal, so he wrote multiple suicide notes.[138]  At approximately 1:00 a.m., Davis approached the PCT desk in the dayroom, where defendant Barker was working.[139]  Davis put three pieces of paper on the desk stating, "I hope you can give these to the appropriate people."[140]  Barker asked Davis what was going on and he stated,

---

[136] (Dkt. # 89, Dante Decl., ¶ 14 & Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at 20.)
[137] (Dkt. # 89, Dante Decl., ¶ 14; Dkt. # 101, Rutherford Decl., Ex. B (Treatment Notes) at 20.)
[138] (Dkt. # 1, Compl. at 13, ¶¶ 79, 81.)
[139] (Dkt. # 88, Barker Decl., ¶ 14 & Ex. A at 1.)
[140] (Dkt. # 88, Barker Decl., ¶ 14 & Ex. A at 1.)

"I told them I was done. I can't take it anymore."[141] When Barker asked what Davis meant by that, Davis showed Barker a handful of white pills and put them in his mouth.[142] It appeared to Barker that Davis then took a drink and swallowed the pills as he turned and walked out of the dayroom.[143]

Barker instructed Davis to wait and asked him what he had just ingested.[144] Davis said, "I told them at my staffing I was going to end it."[145] Barker immediately called for responders to report to the unit.[146] Davis entered his room and closed the door.[147] When responders arrived, Barker opened Davis's door.[148] Davis was sitting in his chair and said, "[w]hat's the big rush? I want to die. I'm refusing all medical treatment by the way."[149]

When Captain Stern arrived in response to Barker's call, Stern was notified that Davis had ingested pills.[150] Nurse Ratchman also arrived and examined Davis at approximately 1:15 a.m.[151]  Nurse Ratchman observed that Davis was not cooperative and would not answer staff's questions about what and how many of the pills he had taken, but did state that he had also swallowed a key, a rock and a pen.[152]   Nurse

---

[141] (Dkt. # 88, Barker Decl., ¶ 15 & Ex. A at 1.)
[142] (Dkt. # 88, Barker Decl., ¶ 15 & Ex. A at 1-2.)
[143] (Dkt. # 88, Barker Decl., ¶ 15 & Ex. A at 2.)
[144] (Dkt. # 88, Barker Decl., ¶ 16.)
[145] (Dkt. # 88, Barker Decl., ¶ 16 & Ex. A at 2.)
[146] (Dkt. # 88, Barker Decl., ¶ 16 & Ex. A at 2.)
[147] (Dkt. # 88, Barker Decl., ¶ 17 & Ex. A at 2.)
[148] (Dkt. # 88, Barker Decl., ¶ 18 & Ex. A at 2.)
[149] (Dkt. # 88, Barker Decl., ¶ 18 & Ex. A at 2.)
[150] (Dkt. # 104, Stern Decl., ¶ 5; Dkt # 100, Ratchman Decl., ¶ 8.)
[151] (Dkt. # 100, Ratchman Decl., ¶ 8.)
[152] (Dkt. # 100, Ratchman Decl., ¶ 7; Dkt. # 104, Stern Decl., ¶ 8 & Ex. A at 3.)

Ratchman noted that Davis was alert and in no physical distress.[153] Nurse Ratchman further found that Davis had checked out 20-30 Tylenol/ASA (aspirin) from the unit over the past several days.[154]

At about 1:25 a.m., Nurse Ratchman notified the on-call physician, Dr. Shekar, who directed that Davis be sent to the emergency room for evaluation.[155] Dr. Shekar stated that Davis could be transported via WRC transport rather than by ambulance.[156] Davis was then restrained and escorted to unit F-11.[157] Once he was transferred to unit F-11, Davis was no longer in Nurse Ratchman's care.[158]

Due to the fact that two other inmates were separately transported to off-site facilities for other emergencies that evening, staffing was low and Davis was not able to be transported immediately.[159] Stern spoke with HSU staff about the situation.[160] An HSU staff member informed Stern that because Davis was in no distress at the time, immediate transport was not necessary.[161]   HSU staff informed Stern that Davis should be transported to the ER no later than 3:00 a.m.[162] Stern then made contact with the PCS who was on the first emergency trip to try to determine if they would be returning to the

---

[153] (Dkt. # 100, Ratchman Decl., ¶ 9.)
[154] (Dkt. # 100, Ratchman Decl., ¶ 8.)
[155] (Dkt. # 100, Ratchman Decl., ¶ 7.)
[156] (Dkt. # 100, Ratchman Decl., ¶ 7.)
[157] (Dkt. # 100, Ratchman Decl., ¶ 10.)
[158] (Dkt. # 100, Ratchman Decl., ¶ 10; Dkt. # 104, Stern Decl., ¶ 7.)
[159] (Dkt. # 104, Stern Decl., ¶ 8 & Ex. A at 3.)
[160] (Dkt. # 104, Stern Decl., ¶ 8.)
[161] (Dkt. # 104, Stern Decl., ¶ 8.)
[162] (Dkt. # 104, Stern Decl., ¶ 8.)

institution in the near future.[163] The PCS could not determine how long his trip would remain at the hospital.[164] At this time, which was approximately 1:45 a.m., Stern called in an extra staff member from home to assist at the institution.[165]

As the extra staff member arrived at the institution at approximately 2:40 a.m., the first medical transport van returned from the hospital.[166] Davis was transported to Aurora Medical Center Emergency Room in Oshkosh at approximately 2:50 a.m.[167] He was admitted by 3:00 a.m.

The hospital admitted Davis for observation, noting that his Tylenol level was "elevated."[168] They monitored him for "hepatic necrosis" (*i.e.*, toxic injury to the liver) and considered whether to treat him for "Tylenol toxicity," but ultimately did not administer anything to counteract his ingestion of over-the-counter medicine.[169] For purposes of removing the foreign objects that he swallowed, Davis was given a saline IV and underwent a gastroenterological endoscopy over 5 hours after arriving at the hospital.[170]

Davis remained at the hospital for several days following his gastroenterological procedure on February 28.  On February 29, Robl and Kaufmann were assigned the

---

[163] (Dkt. # 104, Stern Decl., ¶ 9.)
[164] (Dkt. # 104, Stern Decl., ¶ 9.)
[165] (Dkt. # 104, Stern Decl., ¶ 9.)
[166] (Dkt. # 104, Stern Decl., ¶ 9.)
[167] (Dkt. # 104, Stern Decl., ¶ 9 & Ex. A at 3.)
[168] (Dkt. # 106, Walrath Decl., Ex. A (Hospital Records) at 12.)
[169] (Dkt. # 106, Walrath Decl., Ex. A (Hospital Records) at 10-12.)
[170] (Dkt. # 106, Walrath Decl., Ex. A (Hospital Records) at 16.)

second-shift "vigil duty" for Davis at the hospital.[171] "Vigil duty" is the term WRC personnel use to describe a situation in which institution staff members are assigned on a shift-by-shift basis to monitor an inmate while the inmate is off of WRC grounds for medical treatment.[172]

Robl was aware that Davis was in the hospital as the result of ingesting pills in an effort to self-harm.[173] During that shift, Robl and Kaufmann noted that Davis passed the key and the rock that he had swallowed previously.[174]

During that shift, Davis told Robl that he needed a pen to write a letter to his psychologist (Dr. Dante).[175]  After Kaufmann gave Davis a pen, a nurse from the Aurora hospital staff informed Davis that he could not have the pen.[176]  Davis gave the pen to the nurse without incident.[177]  After the nurse took the pen, Davis alleges that he "stated to Robl and Kaufmann in the presence of the hospital nurse that . . . he was not able to have a pen but at any time he could and probably should swallow the batteries from the Aurora-issued EKG heart monitor."[178] Aurora medical staff had attached the heart monitor to Davis and had placed it in Davis's bed.[179] Robl generally informed Davis that "swallowing batteries would be stupid because batteries are dangerous and if the doctor

---

[171] (Dkt. # 102, Robl Decl., ¶ 5; Dkt. # 95, Kaufmann Decl., ¶ 5.)
[172] (Dkt. # 91, Drake Decl., ¶ 4.)
[173] (Dkt. # 197, Robl Dep. at 9:9-10:10.)
[174] (Dkt. # 95, Kaufmann Decl., ¶ 9; Dkt. # 197, Robl Dep. at 11:20-22.)
[175] (Dkt. # 197, Robl Dep. at 12:8-13.)
[176] (Dkt. # 197, Robl Dep. at 12:18-13:11.)
[177] (Dkt. # 102, Robl Decl., ¶ 6.)
[178] (Dkt. # 119, Pl. Resp. to DPFOF, ¶ 155 (citing Dkt. # 1, Compl., at 16, ¶ 111.)
[179] (Dkt. # 91, Drake Decl., ¶ 7 & Ex. A at pg. 2.)

could not retrieve the batteries, they could cause damage to his stomach or liver and possibly lead to death."[180] The heart monitor remained in Davis's bed.

At the end of Robl and Kaufmann's shift, correctional officers Gassen and Drake took over the vigil at approximately 10:00 p.m. on February 29.[181] Neither Robl nor Kaufmann informed the correctional officers about Davis's comments regarding the heart monitor's batteries. [182] Likewise, neither PCT recorded Davis's remarks in the vigil logbook that was designed to document general information regarding the inmate's behavior, among other things.[183]

The parties dispute whether Davis advised Gassen and Drake of the possibility that he could or would remove the batteries from his heart-monitor in an attempt to commit suicide.  It is undisputed, however, that Drake and Gassen passed time during their shift watching television and playing cribbage while Davis was allowed to manipulate the heart-monitor,[184] which was concealed underneath his bed linens.[185] At approximately 6:02 a.m. on March 1, 2012, Davis slid the battery cover off the heart monitor.[186]  Davis then proceeded to remove the AA batteries from the monitor. [187] As soon as Davis

---

[180] (Dkt. # 102, Robl Decl., ¶ 7.)

[181] (Dkt. # 102, Robl Decl., ¶ 9; Dkt. # 95, Kaufmann Decl., ¶ 10; Dkt. # 91, Drake Decl., ¶ 4.)

[182] (Dkt. # 102, Robl Decl., ¶ 9; Dkt. # 190, Drake Dep. at 31.)

[183] (Dkt. # 95, Kaufmann Decl.¶ 6-9 & Exh. A (Vigil Log); Dkt. # 197, Robl Dep. at 14:9-11; Dkt. # 228, Robl Dep. Exh. 10 (Wisconsin Resource Center Policy No. 3.1.20, Off Grounds Vigil Procedure) at 5.)

[184] (Dkt. # 190, Drake Dep. at 45:21-46:10; Dkt. # 191, Gassen Dep. at 9;13-10:7.)

[185] (Dkt. # 91, Drake Decl., ¶ 7 & Ex. A at pg. 2; Dkt. # 92, Gassen Decl., ¶ 5.)

[186] (Dkt. # 91, Drake Decl., ¶ 7; Dkt. # 92, Gassen Decl., ¶ 5; Dkt. # 95, Kaufmann Decl., Ex. A at pg. 3.)

[187] (Dkt. # 91, Drake Decl., ¶ 8 & Ex. A at pg. 2; Dkt. # 92, Gassen Decl., ¶ 6.)

removed the batteries from the monitor, an alarm sounded at the nurse's station.[188] When a nurse arrived to check on Davis, he was found to have one battery in his hand.[189] When Davis was asked what he did with the other battery, Davis stated that he had swallowed it.[190]

Davis gave up the remaining battery when ordered to do so.[191] Gassen and Drake removed Davis from his bed, placed him in the "Grip Restraint belt," which limited his range of motion by securing his wrists, and thoroughly searched the bed area.[192] The second battery was not found.[193] Davis later underwent another gastroenterological endoscopy to remove the battery that he had swallowed.[194]  Thereafter, Davis returned to WRC, where he resumed DBT treatment.[195]

SELF-HARM ON MAY 2, 2012

---

[188] (Dkt. # 122, Davis Aff. ¶ 47.)
[189] (Dkt. # 91, Drake Decl., ¶ 9 & Ex. A at pg. 2; Dkt. # 92, Gassen Decl., ¶ 7.)
[190] (Dkt. # 91, Drake Decl., ¶ 9 & Ex. A at pg. 2; Dkt. # 92, Gassen Decl., ¶ 7.)
[191] (Dkt. # 91, Drake Decl., ¶ 9.)
[192] (Dkt. # 91, Drake Decl., ¶ 10 & Exh. A at pg. 2; Dkt. # 92, Gassen Decl., ¶ 8.)
[193] (Dkt. # 91, Drake Decl., ¶ 10; Dkt. # 92, Gassen Decl., ¶ 8.)
[194] (Dkt. # 106, Walrath Decl., Exh. A at pg. 19-20.)
[195] (Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at 23-40.)

On the morning of May 2, 2012, at approximately 8:52 a.m., Davis was transferred to unit F-11, which is a segregated observation unit for "acute" or "high-risk" inmates.[196] Davis initially refused to comply with orders to move and a cell extraction team was assembled to gain his compliance.[197]  As a psychiatric care supervisor or PCS, it was defendant Priebe's job to oversee the move.[198]  At that time, Priebe was aware that Davis had engaged in self-harm at WRC on two occasions and that he had been placed in observation previously.[199]  Davis was strip-searched and assigned to observation cell C-130,[200] which was also searched before Davis was placed in it.[201]

Initially, Davis did not want to go into the cell, objecting loudly that there were razors in the cell.[202] Priebe noted that Davis had not been the best occupant of that particular cell before his placement in it.[203] After Davis made the statement regarding razors, Priebe and another staff member searched the cell and did not find any razors or other contraband.[204] Davis was then placed into the cell with only a suicide gown or "safety robe" and blanket.[205]

---

[196] (Dkt. # 99, Priebe Decl., ¶ 5; Dkt. # 199,Weiland Dep. at 5:9-17, 7:16-19.)
[197] (Dkt. # 196, Priebe Dep. at 5:5-17.)
[198] (Dkt. # 196, Priebe Dep. at 3:16, 20-23, 7:23.)
[199] (Dkt. # 196, Priebe Dep. at 8:24-9:22.)
[200] (Dkt. # 99, Priebe Decl., ¶ 5; Priebe Dep. at 20:4-22.)
[201] (Dkt. # 99, Priebe Decl., ¶ 5.)
[202] (Dkt. # 99, Priebe Decl., ¶ 6.)
[203] (Dkt. # 99, Priebe Decl., ¶ 7.)
[204] (Dkt. # 99, Priebe Decl., ¶ 6; Dkt. # 196, Priebe Dep. at 26:13-30:3.)
[205] (Dkt. # 99, Priebe Decl., ¶ 6; Dkt. # 199, Weiland Dep. at 15:11-14.)

Less than one hour after he was placed in observation, Dr. Dante met with

Davis.[206] The following constitute Dante's TxM notes of her encounter with Davis that

morning:

> This writer met with inmate Davis on unit F-11 after he was transferred due
> to his behavior on unit F-10. Inmate Davis initially was uncooperative and
> told this writer to leave him alone. This writer left him alone for some time
> to start the observation paperwork. This writer again attempted to speak to
> Mr. Davis. At this time Mr. Davis was more cooperative . . . . Inmate Davis
> then gave up a metal piece that he had in his cell, but claimed that he
> swallowed the other half. Inmate Davis also reports that he swallowed pills
> when he was still on unit 10. He started to play some games with this writer
> about how and when and what. This writer confronted him on the
> therapeutic relationship and he then admitted that he got the medication
> from another inmate on unit F-10. He states that he was "ripping" open the
> packages, as the staff were trying to get him to comply with the move. He
> said he swallowed them while he had his window covered. Inmate Davis
> continued to present with all or nothing thinking "I don't want to live, but I
> don't want to die [. . . ] I don't want to be at WRC, but I don't want to go
> back to corrections". This writer talked to him about this thinking and how
> it relates to his personality disorder. In time inmate Davis' mood appeared
> to calm down. He then told this writer that he would accept medical
> treatment and he complied with a transport to the emergency to be
> evaluated for the medication and swallowing of the metal piece.

> Assessment:
> Inmate Davis is becoming desperate regarding his emotions in relation to his
> relationship with Becky (his daughters['] mom). He is reacting to these
> emotions by being demanding and turning to self abuse. He reports
> thoughts about suicide; however also talks about plans for the future. Based
> on his history and his current unstable mood, this writer believes he is at a
> risk to harm himself.

> Plan:
> Inmate Davis will be in observation status. This writer communicated with
> unit staff regarding his statements about the medication he took. This

---

[206] (Dkt. # 89, Dante Decl., ¶ 17 & Dkt. # 101, Rutherford Aff., Ex. B at pg. 41 (service start
9:30 and stop 10:00).)

writer looked in his room with unit staff and did not find wrappers to any medication. This writer did find that today he wrote a will and testament.[207]

As Dante's notes reflect, Davis reported that he misused another inmate's medication and swallowed a metal object.[208] Davis claims that the metal object was a razor that was obscured by toilet paper within the cell.[209] PCS Priebe disputes this, believing that the metal piece was likely a component of the light fixture Davis damaged upon placement into the cell.[210]

Davis was taken to the hospital, where an x-ray showed a small foreign object.[211] The hospital staff did not believe that medical treatment was necessary.[212] He was prescribed acetaminophen and instructed to follow up with his primary care provider if he experienced recurrent abdominal pain, fever, bloody vomit, or bright red blood in his stool.[213] Davis was then cleared to return to WRC.

While Davis was at the hospital, PCS Weiland directed WRC staff to search Davis's cell.[214] At least three individuals then thoroughly searched Davis's cell using

---

[207] (Dkt. # 89, Dante Decl., ¶ 17 & Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at 41 (service start 9:30 and stop 10:00).)
[208] (Dkt. # 89, Dante Decl., ¶ 17 & Dkt. # 101, Rutherford Decl., Exh. B (Treatment Notes) at 41 (service start 9:30 and stop 10:00).)
[209] (Dkt. # 122, Davis Aff. ¶ 53; Dkt. # 221, Davis Supp. Decl., ¶ 17.)
[210] (Dkt. # 196, Priebe Dep. at 33:15-34:17.)
[211] (Dkt. # 106, Walrath Decl., Exh. A (Medical Records) at 26, 28-30.)
[212] (Dkt. # 106, Walrath Decl., Exh. A (Medical Records) at 26, 28-30.)
[213] (Dkt. # 106, Walrath Decl., Exh. A (Medical Records) at 29.)
[214] (Dkt. # 199, Weiland Dep. at 19:22-20:20.)

special "search kits."[215]   Davis returned from the hospital at approximately 1:35 p.m. and Weiland approved his placement into observation status.[216]

At that time, Dr. Dante was also called to the unit to assess the level of his placement on the unit.[217]   Before being placed in the observation cell, Davis was strip searched for any contraband or items that could be deemed harmful to Davis, other inmates, and/or WRC staff.[218] During placement, Davis again claimed that there were razors in his cell and that he would use them for self-harm.[219] Davis demanded to be put in restraints.[220]   Weiland did not believe that there was a threat to Davis's safety because his cell had been thoroughly searched while he was at the hospital.[221]

At approximately 2:05 p.m., Weiland was notified by unit staff that there was an incident on the F-11 unit and she reported to Davis's cell.[222]   Weiland noted that there was blood on the window.[223] A staff member also informed Weiland that she observed Davis swallow what appeared to be a razor blade and that he had some cuts on his arm.[224] Davis also had what appeared to be another half of a razor blade in his hand and told

---

[215] (Dkt. # 199, Weiland Dep. at 19:22-20:20.)

[216] (Dkt. # 107, Weiland Decl., ¶ 5 & Exh. A at 1.)

[217] (Dkt. # 199, Weiland Dep. at 22:12-20.)

[218] (Dkt. # 107, Weiland Decl., ¶ 6 & Exh. A at 1, Exh. C at 10.)

[219] (Dkt. # 199, Weiland Dep. at 18:2-5.)

[220] (Dkt. # 199, Weiland Dep. at 19:13-15.)

[221] (Dkt. # 199, Weiland Dep. at 19:22-20:25.)

[222] (Dkt. # 107, Weiland Decl., ¶ 10 & Exh. B at 8.)

[223] (Dkt. # 107, Weiland Decl., ¶ 10 & Exh. B at 8.)

[224] (Dkt. # 107, Weiland Decl., ¶ 11 & Exh. B at 8.)

Weiland that he had the other half in his mouth.[225] Weiland then radioed the shift captain and asked him to report to the unit.[226]

In the interim, Davis complied with orders by putting his hands out the trap and handing over the remaining razor blade.[227] Staff applied a washcloth with pressure on his wounded arm.[228] The decision was then made to place Davis in full bed restraints for his own safety.[229] Dr. Dante approved that placement at 2:30 p.m.[230]

Eventually, Davis allowed the on-call physician (Dr. Ganon) to check his wounds.[231] The physician determined that Davis did not need stitches and there was no active bleeding.[232] Davis remained on observation status until the next afternoon at 4:00 p.m.[233]

## OPINION

Defendants move for summary judgment, arguing that Davis fails to show that they were deliberately indifferent to his health or safety. They argue, therefore, that they are entitled to qualified immunity from Davis's claims that they failed to protect him from self-harm. Defendants argue further that Davis's state law claims for negligence and

---

[225] (Dkt. # 107, Weiland Decl., ¶ 11 & Exh. B at 8.)
[226] (Dkt. # 107, Weiland Decl., ¶ 12 & Exh. B at 8.)
[227] (Dkt. # 107, Weiland Decl., ¶ 13 & Exh. B at 8.)
[228] (Dkt. # 107, Weiland Decl., ¶ 13 & Exh. B at 8.)
[229] (Dkt. # 107, Weiland Decl., ¶ 14 & Exh. B at 8-9.)
[230] (Dkt. # 199, Weiland Dep. at 30:25-31:6; Dkt. # 89, Dante Decl., Exh. A at 3.)
[231] (Dkt. # 107, Weiland Decl., ¶ 15 & Exh. B at 9.)
[232] (Dkt. # 107, Weiland Decl., ¶ 15 & Exh. B at 9.)
[233] (Dkt. # 107, Weiland Decl., ¶ 9 & Exh. A at 7.)

medical malpractice fail as a matter of law.  The parties' contentions are addressed in more detail below under the governing legal standards that apply in this case.

## I.    Summary Judgment

The purpose of summary judgment is to determine whether the parties have gathered and can present enough evidence to support a jury verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).   Summary judgment is appropriate if there are no genuinely disputed material facts, and if on the undisputed facts, the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The applicable substantive law will dictate which facts are material.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005).

In determining whether a genuine issue of material fact exists, the court must construe all facts in favor of the nonmoving party.  *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).  Even so, the non-movant may not simply rest on the allegations in his pleadings; rather, he must respond by presenting specific facts that would support a jury's verdict in his favor on his claims.  *Hunter v. Amin*, 583 F.3d 486,

489 (7th Cir. 2009); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

## II.  **Qualified Immunity**

Governmental actors performing discretionary functions enjoy "qualified immunity," meaning that they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)).   As a defense, "[q]ualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether a defendant is entitled to qualified immunity, a court must consider two questions: (1) whether plaintiff has alleged or shown a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time the alleged violation occurred.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

40

"Qualified immunity is applicable unless the defendant's conduct violated a clearly established constitutional right." *Id.*   A court is permitted to consider these questions in any order in light of the circumstances in the particular case at hand.   *Id.* at 236. Although qualified immunity is a defense, the plaintiff bears the burden of defeating it. *Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).

## III.   Eighth Amendment — Failure to Protect from Self-Harm

The Eighth Amendment, which prohibits "punishment" that is "cruel and unusual," imposes a duty on prison officials to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and medical care.   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   Prison officials also must ensure that "reasonable measures" are taken to guarantee inmate safety and prevent harm. *Id*.   To prevail under the Eighth Amendment based on a failure to prevent harm, an inmate must demonstrate that (1) the harm that befell the prisoner was objectively, sufficiently serious and a substantial risk to his health or safety; and (2) the individual defendants were deliberately indifferent to that risk.   *Id*.; *see also, e.g., Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Matos ex. Rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003) (citation omitted)).   Liability under the deliberate-indifference standard requires more than mere negligence, gross negligence or recklessness; rather, it is satisfied only by conduct that approaches intentional wrongdoing -- "something less than

41

acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Suicide, attempted suicide and other acts of self-harm clearly pose a "serious" risk to an inmate's health and safety. *See Collins*, 462 F.3d at 760 (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001)); *see also Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies."). At the same time, courts have recognized that "[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *see also Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (7th Cir. 1998) ("No one can predict suicide with any level of certainty[.]"). Where the harm at issue is a suicide or attempted suicide, deliberate indifference requires "a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded that risk." *Collins*, 462 F.3d at 761 (citing *Matos*, 335 F.3d at 557).

### A. Self-Harm on January 5, 2012: Claims Against Dr. Rutherford

Davis contends that Dr. Rutherford was deliberately indifferent by ignoring his threat of self-harm and other signs of his intent to commit suicide on January 5, 2012, violating his Eighth Amendment rights. In particular, Davis claims that Dr. Rutherford

should have seen him immediately in response to his PSR, which expressed suicidal thoughts, instead of deciding to meet with him after another, previously scheduled client.

Assuming that Davis's version of the events is accurate, defendants argue that Rutherford's decision (to not give in to Davis's demand for immediate attention) was consistent with the implementation of DBT.[234]   Defendants maintain that Rutherford's decision was reasonable, given that Davis had a history of saying that he would harm himself in order to get staff to respond, and had not actually acted on any threat of self-harm in nearly three years.[235]

The primary flaw in this argument is that Dr. Rutherford was not trained in DBT and had no role in providing Davis with DBT treatment.[236]   In fact, the record reflects that Davis did not begin receiving DBT treatment until January 24, 2012,[237] and did not begin individual therapy in DBT until early February 2012, when Dr. Dante was assigned as his primary clinician.[238] For this reason, defendants cannot show that Dr. Rutherford's actions were based on DBT treatment methods.

In addition, Davis notes that Dr. Rutherford had reviewed his file and knew of his history of self-harm.   Based upon her review of his history, Rutherford considered him a potential risk for self-harm or suicide just one month earlier.[239]   According to Davis, Rutherford also knew that he was upset after meeting with him on January 3, and that he

---

[234] (Dkt. # 216, Defendants' Br. at 18.)
[235] (Dkt. # 216, Defendants' Br. at 18.)
[236] (Dkt. # 220, Rutherford Dep. at 70:17-21.)
[237] (Dkt. # 101, Rutherford Decl., Exh. A (Treatment Learning Plan) at 5.)
[238] (Dkt. # 220, Rutherford Dep. at 17:15-18:23, 61:18-23; Dkt. # 225, DeClercq Decl., Exh. A (Treatment Learning Plan) at 2.)

had stopped taking his medication, which "increased the likelihood" or risk he could self-harm or attempt suicide.[240]   At a minimum, Davis argues that Rutherford was required to perform a risk assessment to determine whether Davis was at risk for suicide or self-harm when he submitted the PSR on January 5.   Moreover, he argues that if Rutherford concluded that there was an immediate risk of suicide or self-harm, she had the authority to move him into observation status to protect against that risk.[241]   And even if there was not an imminent risk, she could have instructed another staff-member to check on or follow-up with Davis to ensure that his level of risk had not increased.[242]

Conceding all of the factual disputes to Davis, as the court must on summary judgment, this is still a very close question since Rutherford (1) knew that Davis used threats of self-harm to manipulate staff; (2) while aware that he was a potential risk for self-harm, increased by recent agitation and going off of his medication, also knew that he had not acted out for three years; and (3) must exercise professional judgment in deciding how to prioritize demands on her and other staff time.   While Rutherford acknowledges she performed no risk assessment after receiving the PSR advising her that Davis was having suicidal thoughts on January 5,[243] there is nothing in the record to support a finding that this constituted more than her negligent exercise of professional judgment, not deliberate indifference.   Indeed, plaintiff's expert opines no more, claiming that Rutherford failure to conduct an immediate risk assessment fell short of the standard set

---

[239]  (Dkt. # 220, Rutherford Dep. at 56:16-25.)
[240]  (Dkt. # 220, Rutherford Dep. at 87:15-88:5.)
[241]  (Dkt. # 220, Rutherford Dep. at 40.)
[242]  (Dkt. # 220, Rutherford Dep. at 42.)

by DOC's suicide prevention policy, rather than constituted reckless disregard of it or of the norms of psychiatric care generally.  Nor is the court comfortable with leaving that question to a lay jury absent more guidance.  Indeed, to do so would seem to deny penal psychologists exactly the "breathing room" the doctrine of good faith immunity is intended to create.  Moreover, the court does not believe a reasonable jury could find Rutherford acted with deliberate indifference to a *known* risk that Davis would attempt suicide or otherwise engage in self-harm on January 5 on this record.  *See Collins*, 462 F.3d at 761 (citing *Matos*, 335 F.3d at 557).  Accordingly, both qualified immunity standards preclude Davis from proceeding on his claim against Dr. Rutherford concerning the incident that occurred on January 5.

### B.  Self-Harm on January 5, 2012: Claims Against Stoinski

Davis contends further that Stoinski acted with deliberate indifference by failing to take reasonable measures to protect him from self-harm after Davis reported having suicidal thoughts and asking to see a psychologist on January 5.  Stoinski did not ask Davis any follow-up questions or make an effort to observe Davis's behavior after Dr. Rutherford declined to see him.[244]

Assuming that Davis's version of the incident is accurate, defendants argue that Stoinski's response was still consistent with the implementation of DBT.[245]  (Dkt. # 216, at 20.)  Defendants also contend that Stoinski appropriately deferred to Rutherford's

---

[243] (Dkt. # 220, Rutherford Dep. at 99:1-100:20.)

professional judgment that a consultation could wait until after she finished seeing her scheduled clients.[246]

For the same reason discussed previously, Stoinski's failure to respond or inquire further cannot be justified as part of DBT treatment:  Davis did not begin DBT treatment until January 24, 2012.[247]   Stoinski also cannot rely on Rutherford's determination that a consultation could wait since her decision not to undertake an immediate risk assessment of the situation is arguably not the same as opining that Davis posed no risk.  Stoinski concedes that he knew Davis had a history of self-harm, was having suicidal thoughts and "probably" knew that Davis had threatened to commit suicide on January 8.[248]   Stoinski allowed Davis to check out restricted sharp objects (the fingernail and toenail clippers) before allowing him to return to his room unsupervised.

Stoinski also concedes that fingernail and toenail clippers are considered to be "hazardous or potentially hazardous material" kept at the PCT desk for check out by an inmate.[249]   Specifically, they are items that WRC requires to be documented on a so-called "sharps checkout log" when checked out by an inmate.[250]   Still, even with knowledge of Davis's history and recent expressions of self-harm, Stoinski did not first

---

[244]  (Dkt. # 198, Stoinski Dep. at 13, 17-18, 58.)
[245]  (Dkt. # 216, Defendants' Br. at 20.)
[246]  (Dkt. # 216, Defendants' Br. at 20.)
[247]  (Dkt. # 101, Rutherford Decl., Exh. A (Treatment Learning Plan) at 5.)
[248]  (Dkt. # 198, Stoinski Dep. at 8:18-21.)
[249]  (Dkt. # 198, Stoinski Dep. at 27:12-21.)
[250]  (Dkt. # 198, Stoinski Dep. at 27:5-21; Dkt. # 225, DeClercq Decl., Exh. C (Sharps Checkout Log).)

contact a trained psychologist, such as Rutherford, about whether the fingernail and toenail clipper should be given to Davis unsupervised.[251]

As a PCT, Stoinski did not have authority to place someone in observation status, but he was responsible for alerting a supervisor to make them aware of any serious threat to inmate safety.[252]   Davis's social worker, Alicia Hans, encountered Davis while he was packing his things and observed that Davis was "upset" and "agitated."[253]   If Stoinski was concerned about an inmate's risk of self-harm or suicide, he reportedly would "keep a close eye on them," until a supervisor or psychology associate arrived to assess the situation.[254]  Stoinski did not, however, keep a close eye on Davis on January 5th.

Based on this record, although still a close question, there is a factual dispute over whether Stoinski acted with deliberate indifference to a known risk by failing to restrict Davis's access to potentially hazardous sharp objects and keep him under closer supervision until Dr. Rutherford could conduct a proper assessment of his risk for self-harm.  *See Collins*, 462 F.3d at 761 (citing *Matos*, 335 F.3d at 557).   Moreover, this fact issue precludes both qualified immunity and summary judgment on Davis's claim against Stoinski regarding the acts of self-harm that occurred on January 5, 2012.

### C. Risk of Suicide on February 23, 2012: Claims Against Harding, Dehn, Miller and Rutherford

---

[251] (Dkt. # 198, Stoinski Dep. at 30.)   Notably, Rutherford stated in her deposition that she would not have given Davis fingernail and toenail clippers or cleaning solution on the morning of January 5.   (Dkt. # 220, Rutherford Dep. at 107:19-25.)

[252] (Dkt. # 198, Stoinski Dep. at 56:2-10.)

[253] (Dkt. # 192, Hans Dep. at 50:7-14.)

[254] (Dkt. # 198, Stoinski Dep. at 56:17-20.)

On February 20 or 21, Davis threatened to commit suicide by March 1 if his back pain was not addressed by the HSU.  Davis contends that Harding, Dehn, Miller and Rutherford were deliberately indifferent to a known risk of suicide when he sought assistance in drafting a will on or about February 23, 2012.

Defendants note that Rutherford alerted Dr. Dante, who was Davis's primary clinician, of Davis's new threat.[255]  Davis's conduct was also the subject of a February 23 staffing meeting, where the treatment team discussed taking Davis out of DBT and returning him to DOC if his behavior of threats and acts of self-harm continued.[256]   One of the goals identified at the February 23 meeting was to eliminate self-harm and threats of self-harm as a means of getting his needs met.[257]   The February 23 TLP reflects that Rutherford changed Davis's mental health code from MH-1 to MH-2b,[258] indicating that he was at increased risk of self-harm because of his "emotional reactivity."[259]   At that time, however, neither Rutherford nor Dante believed that there was an imminent risk to Davis's safety.[260]

Davis nevertheless contends that he should have been placed in observation on February 23 once he began inquiring about making out a will.  The record reflects, however, that Harding questioned Davis specifically about whether he had any intention or plan to commit suicide and Davis assured her that he did not.   Moreover, Davis points

---

[255] (Dkt. # 225, DeClercq Decl., Exh. I (E-mail Correspondence).)
[256] (Dkt. # 101, Rutherford Decl., Exh. A (Treatment Learning Plan) at 5.)
[257] (Dkt. # 101, Rutherford Decl., Exh. A (Treatment Learning Plan) at 2.)
[258] (Dkt. # 101, Rutherford Decl., Exh. A (Treatment Learning Plan) at 1.)
[259] (Dkt. # 220, Rutherford Dep. at 130:2-132:8.)
[260] (Dkt. # 220, Rutherford Dep. at 130:2-132:8.)

to no other evidence that supports a finding that he was in imminent danger of self-harm or suicide on February 23, and he does not otherwise show that defendants were aware of any such risk but failed to take reasonable measures to ensure his safety. Indeed, plaintiff does not respond to defendants' argument on summary judgment and appears to have abandoned this claim. Accordingly, the court will grant defendants' motion for summary judgment on the claim that Harding, Dehn, Miller and Rutherford acted with deliberate indifference to a known risk of self-harm or suicide on February 23rd.

### D. Misuse of Over-The-Counter Medication on February 28, 2012: Claims Against Rockow, Barker, Stoinski, Dehn, Lemke and Harding

Davis contends that several PCTs (Rockow, Barker, Stoinski, Dehn and Lemke) gave him over-the-counter medication during February 2012, but failed to observe him ingest the pills. Davis complained of this practice in a note to Harding on February 23, 2012, but she apparently took no immediate action to address it. Eventually, Davis stockpiled some Tylenol and aspirin, ingesting them in an act of self-harm early on the morning February 28, 2012.

Defendants maintain that this claim fails because Davis did not suffer objectively serious harm as the result of swallowing over-the-counter medication. There is a dispute about how many pills Davis ingested on February 28. Davis claims that he took approximately 50 to 60 pills of Tylenol and aspirin that he had either stockpiled or obtained from other inmates who had been allowed to "cheek" pills administered by

defendants Lemke, Stoinski, Dehn, Rockow and Barker.[261]   Davis told medical personnel at the hospital that he ingested around 30 to 40 pills.[262]   Nurse Ratchman determined that Davis had signed out about 20 to 30 Tylenol in the days prior to his overdose.[263]

The medical records confirm that the amount of medication Davis ingested exceeded his own needs and that he was admitted to the hospital primarily for observation due to the foreign objects that he swallowed.[264]   Even so, Davis required monitoring for potential damage due to Tylenol toxicity in the wake of his suicide attempt.[265]   Because it is disputed how many pills Davis actually ingested or the effect the overdose may have had on his system, the court rejects defendants' argument that Davis's attempt to commit suicide or self-harm by swallowing as many as 60 pills was not a sufficiently serious risk to his health and safety.   *See Collins,* 462 F.3d at 760; *Sanville,* 266 F.3d at 733.

Assuming that the harm was serious, defendants also maintain that Rockow, Barker, Stoinski, Dehn and Lemke could not reasonably be found to have been deliberately indifferent to the risks if there was no policy in place at the time requiring the PCTs to make sure that over-the-counter medication was actually ingested when dispensed.   In response, Davis notes that there is a policy on dispensing prescription medication that required PCTs to ensure that inmates are not "cheeking" or hiding the

---

[261] (Dkt. # 221, Davis Supp. Decl. at ¶ 10.)
[262] (Dkt. # 106, Walrath Decl., Exh. A at 10.)
[263] (Dkt. # 106, Walrath Decl., Exh. A at 6.)
[264] (Dkt. # 106, Walrath Decl., Exh. A at 10, 12, 14.)
[265] (Dkt. # 106, Walrath Decl., Exh. A at 10-11.)

medication on the inside of their cheeks.[266]   That policy actually governs the administration of prescription medication by a nurse clinician and provides for a "thorough mouth check" where an inmate has been found to be cheeking or suspected of cheeking:

> Inmate/patients may have a visual mouth inspection by the unit PCT/Officer following medication administration.   NC may randomly perform thorough mouth checks with a flashlight and tongue blade. Inmates/patients found to be "cheeking", or suspected of "cheeking" medication, will have a thorough mouth check during every medication pass, or an individualized approach will be implemented.   The treatment team in consultation with HSU and Attending Physician will determine the individualized approach.   Inmates/patients in noncompliance with this policy will be referred to the treatment team.[267]

There was no similar policy in place for over-the-counter medication.[268]   Before February 28, PCTs administering over-the-counter Tylenol or aspirin generally watched the inmate put the pills in his mouth and proceed to the sink or bubbler.[269]   The bubbler is in clear view of the unit desk where staff are stationed.[270]   After Davis overdosed on February 28, Harding made a verbal request that PCTs administer over-the-counter medication while making sure that inmates bring water up to the desk at the time they request the medication and ensuring that they had swallowed the pills.[271]

---

[266] (Dkt. # 195, Lemke Dep. at 37:20-23 ("cheeking" occurs when inmates "put the medication on the inside of their cheeks and hide them" instead of ingesting them).)

[267] (Dkt. # 226, Lemke Dep. Exh. 9 (Wisconsin Resource Center Policy No. 4.5.22, Medication Administration) at 5.)

[268] (Dkt. # 194, Harding Dep. at 102:17-103:24.)

[269] (Dkt. # 194, Harding Dep. at 101:2-102:13; Dkt. # 195, Lemke Dep. at 35-36; Dkt. # 198, Stoinski Dep. at 49.)

[270] (Dkt. # 94, Harding Decl., ¶ 25.)

[271] (Dkt. # 194, Harding Dep. at 104:5-18; Dkt. # 195, Lemke Dep. at 33:4-6; 41:14-43:4.)

Before Davis's attempted overdose on February 28, however, there is no evidence showing that any of the PCTs (Rockow, Barker, Stoinski, Lemke or Dehn) knew or had reason to suspect that Davis or any other inmate was cheeking Tylenol or any other over-the-counter medicine.[272]   Should they have taken additional precautions? Arguably, but absent a showing that there was a known risk of harm, the PCTs failure to take additional measures presents, at most, a question of negligence, not deliberate indifference.   Evidence of negligence is insufficient to establish liability under the deliberate-indifference standard.   *See Farmer*, 511 U.S. at 835 (liability under the deliberate-indifference standard requires more than mere negligence, gross negligence or recklessness); *McGee v. Adams*, 721 F.3d 474, 480-81 (7th Cir. 2013) (Deliberate indifference requires more than negligence, rather the defendant "must meet 'essentially a criminal recklessness standard, that is, ignoring a known risk.'") (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)).   Because Davis does not demonstrate that Rockow, Barker, Stoinski, Lemke or Dehn knew of, but disregarded, an obvious risk that he was cheeking or stockpiling over-the-counter medication, these defendants are entitled to qualified immunity from this claim.

Davis's allegations against Harding present a separate question.   Davis avers that he sent Harding a note on or about February 23, advising her that staff was not watching inmates ingest Tylenol or aspirin and that he believed it put inmates "at risk."[273] Harding

---

[272]  Davis concedes that he did not notify any of the PCTs that he was hoarding Tylenol or that he had concerns about the manner in which over-the-counter medication was dispensed.  (Dkt. # 185, Davis Dep. at 141.)

[273]  (Dkt. # 119, Plaintiff's Resp. to DPFOF ¶ 101 (citing Davis Aff., ¶ 33).)

recalls receiving Davis's note, but does not know the exact date that she received it.[274] There is a dispute about what, if anything, Harding did after she received the note.   After Harding confronted him about the note, Davis claims to have told her that he "had some pills but that they were hidden so well she'd never find them."[275]   Harding denies that this conversation occurred.[276]

For purposes of summary judgment, however, defendants concede that there is a fact issue about whether Harding failed to take reasonable steps to ensure his safety by questioning Davis to determine whether he was cheeking medication or advising staff to take precautions against cheeking of over-the-counter medication.[277]   Accordingly, to the extent that Davis claims that Harding was deliberately indifferent on or about February 23, 2012, by failing to take reasonable measures to prevent him from stockpiling over-the-counter medication, defendants' motion for summary judgment will be denied.

### E. Denial of Prompt Medical Care: February 28, 2012: Claims Against Captain Stern

Davis contends that Stern acted with deliberate indifference by failing to get him immediate medical attention following his acts of self-harm on the night of February 27 and the misuse of medication during the early morning hours of February 28, 2012.   In particular, Davis contends Captain Stern should have directed that he be sent to the hospital immediately by ambulance instead of waiting for the WRC transport vehicle.

---

[274] (Dkt. # 94, Harding Decl., ¶ 25.)
[275] (Dkt. # 119, Plaintiff's Resp. to DPFOF ¶ 101 (citing Davis Aff., ¶ 33).)
[276] (Dkt. # 236, Defendants' Reply Br. at 13.)

Defendants note that Davis was evaluated at approximately 1:25 a.m. by Nurse Ratchman, who determined that Davis was not in physical distress.[278] Defendants also note that Stern elected to wait after consulting with HSU staff (including Nurse Ratchman and Dr. Shekar) and believed that Davis was in no distress and that immediate transport was not necessary.[279]   Moreover, Davis *was* eventually transported to the emergency room at 2:50 a.m.,[280] arriving at the hospital by 3:00 a.m.   Thus, the delay at issue was no more than an hour and a half.

Allegations of delayed care may violate the Eighth Amendment if the delay caused the inmate's condition to worsen or unnecessarily prolonged his pain.   *Estelle*, 429 U.S. at 104-05; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted).   To prevail, a plaintiff must introduce "verifying medical evidence that shows his condition worsened because of the delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007)). Davis submits no such evidence here.

Defendants argue that any delay in getting Davis to the hospital was inconsequential.   Indeed, he was not given anything to counteract the ingestion of over-the-counter medication even after arriving at the hospital.   Moreover, there was an

---

[277] (Dkt. # 194, Harding Dep. at 98:2-99:17.)
[278] (Dkt. # 100, Ratchman Decl., ¶ 8; Dkt. # 104, Stern Decl., ¶ 6.)
[279] (Dkt. # 104, Stern Decl., ¶¶ 6, 8.)
[280] (Dkt. # 104, Stern Decl., ¶ 9 & Ex. A at pg. 3.)

additional delay of over 5 hours after arriving at the hospital before he was given saline and a gastroenterological endoscopy for the foreign objects he swallowed.   Assuming that Davis was experiencing discomfort from having ingested an excessive amount of Tylenol along with several foreign objects, Davis does not demonstrate that Stern's arguable hour-and-a-half delay caused his condition to worsen or that his discomfort was unduly prolonged by that delay.   *See Knight*, 590 F.3d at 466.

Even assuming that Davis was harmed somehow by the delay in transporting him to the hospital, he offers no evidence that Stern's delay was the product of deliberate indifference.   As a security officer, Stern credibly claimed to have deferred "to health care professionals as to whether particular situations are emergent to the extent that an immediate transport for off-site services are necessary for an inmate's medical condition."[281]   Moreover, the record confirms that Stern communicated with HSU staff during the incident and with the WRC personnel to coordinate Davis's transport to the hospital.[282]   As defendants note, the on-call physician (Dr. Shekar) stated that Davis could be transported to the hospital by WRC transport rather than by ambulance.[283] Nurse Ratchman also explains that the decision to use WRC transport signifies that there was no risk to the airway, breathing or circulation of the inmate.[284]   Finally, it is undisputed Stern took steps to coordinate with the transport vehicle and to call in extra

---

[281] (Dkt. # 104, Stern Decl., at ¶ 12.)
[282] (Dkt. # 104, Stern Decl., at ¶ 8.)
[283] (Dkt. # 100, Ratchman Decl., at ¶ 9; Dkt. # 104, Stern Decl., at ¶ 6.)
[284] (Dkt. # 100, Ratchman Decl., at ¶ 9.)

staff to report to WRC in the middle of the night so that Davis could get to the hospital within the timeframe indicated by HSU staff.[285]

Based on this record, no reasonable jury could find Stern knew of, but deliberately disregarded, a substantial risk of serious harm to Davis's health or safety by not transporting him to the hospital immediately or by WRC transport.  In fact, all the evidence is to the contrary.  Accordingly, Stern is entitled to qualified immunity and the defendants' motion for summary judgment on this issue will be granted.

### F.  Self-Harm on February 29, 2012: Claims Against Robl and Kaufmann

Davis contends that Robl and Kaufmann failed to take reasonable measures when Davis threatened to swallow the batteries from his EKG heart monitor at the hospital on February 29, 2012.   Davis maintains that Robl and Kaufmann were deliberately indifferent by not asking, in response to Davis's threat to swallow the batteries in his heart monitor, that the battery-powered heart monitor in Davis's room be replaced with one operating without batteries.[286]   Noting further that there is a "vigil logbook,"[287] Davis contends that Robl and Kaufmann acted with deliberate indifference by not recording his comments or advising the next shift (staffed by defendants Drake and Gassen) that Davis was at substantial risk of self-harm or attempting suicide based on his comment about swallowing the batteries from his heart monitor.

---

[285]  (Dkt. # 104, Stern Decl., at ¶ 9.)
[286]  Apparently, a plug-in monitor was available at the Aurora Medical Center at that time.
[287]  (Dkt. # 190, Drake Dep. at 32:6-10; Dkt. # 228, Robl Dep. Exh. 10 (Wisconsin Resource Center Policy No. 3.1.20 Off Grounds Vigil Procedure) at 5.)

Defendants point out that Davis also made the comments about the batteries in the presence of the nurse, and that the nurse took away Davis's pen, but left the battery-powered heart monitor in place.[288]    Defendants argue that they relied on the nurse's professional judgment in allowing the battery-powered heart monitor to remain in Davis's room despite overhearing the same statement about swallowing the batteries.

Kaufmann also does not recall overhearing any threat of self-harm while he was on duty on February 29.[289]    Davis concedes that Kaufmann was out of the room during his conversation with Robl about eating the batteries in the heart monitor,[290] but claims that Kaufmann returned to the room before that conversation ended and was present when Robl told him that he could die if he swallowed the heart monitor batteries.[291]

Robl acknowledges that Davis told him it would be easy for him to eat the batteries from his heart monitor.[292]    However, Robl did not know *why* Davis was on vigil and did not document the conversation regarding batteries in the vigil log or report it to his supervisor because Davis did not affirmatively state an intent to harm himself.[293] Robl explains that he did not record Davis's comment about the batteries in his heart monitor or advise Drake and Gassen about Davis's remark because he did not believe Davis was serious.[294]    Robl noted that Davis's demeanor was "very appropriate" and he

---

[288] (Dkt. # 216, Defendants' Br. at 29; Dkt. # 215, DPFOF at ¶ 158.)
[289] (Dkt. # 95, Kaufmann Decl., at ¶ 7.)
[290] (Dkt. # 221, Davis Supp. Decl., at ¶ 13.)
[291] (Dkt. # 221, Davis Supp. Decl., at ¶ 13.)
[292] (Dkt. # 102, Robl Decl., at ¶ 7.)
[293] (Dkt. # 102, Robl Decl., at ¶¶ 5, 8.)
[294] (Dkt. # 197, Robl Dep. at 14:9-21.)

did not perceive him to be "acting out."[295]   Robl also knew that if the batteries were pulled out of a heart monitor, then alarms would go off.[296]   More importantly, Robl did not believe that Davis would be able to successfully remove the batteries undetected while under the type of supervision that occurs during a vigil.[297]

As defendants note, PCTs are not trained to provide medical care and there is no evidence showing that they were in a position to question the judgment of hospital personnel, who plainly chose to position and leave the battery-operated heart monitor within Davis's reach even after Davis's threat.   To the extent that Robl overheard Davis's comments about the batteries, there is no evidence that Robl knew Davis was in the hospital for swallowing foreign objects or that he perceived, but turned a blind eye toward an obvious risk that he would.

Should Robl have taken additional precautions by recording Davis's comments in the vigil log or alerting the next shift of officers on vigil duty (Drake and Gassen)?   This is a closer call.   Again, there is no evidence that Robl or Kaufmann knew either that Davis was prone to swallow foreign objects or that he harbored an imminent intention to do so.   Further, the undisputed evidence supports a finding that the PCTs justifiably relied on hospital personnel regarding the placement of the heart monitor in close proximity to Davis.   Similarly, there is nothing in this record to undermine Robl's claimed confidence that Davis could not remove the batteries without triggering an alarm or that he would not be able to remove them while under the type of close supervision

---

[295] (Dkt. # 197, Robl Dep. at 15:9-11.)
[296] (Dkt. # 197, Robl Dep. at 14:16-21.)

afforded during a vigil.   Under these circumstances, no reasonably jury could find Robl's and Kaufmann's failure to alert the next shift about Davis's remarks rises beyond to the level of negligence, which is insufficient to demonstrate deliberate indifference.   *See Farmer*, 511 U.S. at 835; *McGee*, 721 F.3d at 480-81.   Because Davis does not demonstrate that Kaufmann or Robl knew of and intentionally disregarded an obvious risk that Davis would remove and swallow batteries from his heart monitor, these defendants are entitled to qualified immunity from this claim.

### G. Self-Harm on February 29 & March 1, 2012: Claims Against Drake and Gassen

Davis contends that Drake and Gassen failed to take reasonable measures to prevent him from engaging in self-harm on the evening of February 29 and early morning of March 1, 2012, when he swallowed a battery from his heart monitor.   The parties dispute much of what occurred during Drake's and Gassen's shift.   In particular, Davis states that he told Drake about his earlier threat to swallow the batteries in the heart monitor.[298]   Gassen was reportedly listening during this time.[299]   Davis also claims he gave Drake a letter written to Dr. Dante, which expressed his intent to commit suicide.[300] Davis contends, therefore, that Drake and Gassen were deliberately indifferent for failing to observe him with care throughout the vigil.   In that respect, it is undisputed that

---

[297] (Dkt. # 197, Robl Dep. at 15:9-16:18.)
[298] (Dkt. # 122, Davis Aff. at ¶ 49; Dkt. # 185, Davis Dep. at 72.)
[299] (Dkt. # 122, Davis Aff. at ¶ 49; Dkt. # 221, Davis Supp. Decl., at ¶ 15.)
[300] (Dkt. # 122, Davis Aff. at ¶¶ 49-50; Dkt. # 185, Davis Dep. at 73-74.)

Drake and Gassen were likely watching television and playing a game of cribbage when Davis slipped the batteries from his heart monitor and swallowed one of them.[301]

From this record, a reasonable jury could find that Drake and Gassen were distracted and did not pay close attention to Davis during the entire vigil in violation of WRC policy. There is a policy that sets forth "off ground vigil procedures" for WRC inmates, which requires officers to pay "extremely close attention" to the inmate/patient that they are assigned to watch.[302] Moreover, Drake concedes that Gassen and he were "probably not" supposed to be playing a game during the vigil.[303]

There is also evidence that Drake and Gassen did not pay close attention to Davis's hands in particular or the heart monitor generally that was then located on his bed. Gassen concedes that Davis may have concealed his hands under the covers to manipulate the heart monitor away from the officer's view.[304] Drake admits that there were times when Davis was "tossing and turning" while his hands and the heart monitor were obscured from his view by bed linen.[305] There is a policy that sets forth "off ground vigil procedures" for WRC inmates, which states that, "[e]xcept when medically necessary the inmate/patient's hands must be visible at all times."[306]

Ordinarily, however, a failure to follow policy is not sufficient to demonstrate a constitutional violation. *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir.

---

[301] (Dkt. # 190, Drake Dep. at 45:20-46:10.)

[302] (Dkt. # 228, Robl Dep. Exh. 10 (WRC Policy No. 3.1.20 Off Grounds Vigil Procedure) at 5.)

[303] (Dkt. # 190, Drake Dep. at 66:22-67:7.)

[304] (Dkt. # 191, Gassen Dep. at 13:21-15:4.)

[305] (Dkt. # 190, Drake Dep. at 51:19-52:6.)

[306] (Dkt. # 228, Robl Dep. Exh. 10 (WRC Policy No. 3.1.20 Off Grounds Vigil Procedure) at 4.)

2003); *see also Lewis v. Richards*, 107 F.3d 549, 554 n.5 (7th Cir. 1997) (noting that "ignoring internal prison procedures does not mean that a constitutional violation has occurred") (citing *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996)).   Here, there are nevertheless fact questions about whether Drake and Gassen knew that Davis was in the hospital for engaging in self-harm by swallowing foreign objects.   Gassen does not recall whether he was told that Davis was in the hospital for attempting suicide, but he may have assumed as much given that many of the inmates at WRC have a history of engaging in self-harm.[307]   Drake does not recall receiving any specific information about Davis before his shift started on February 29,[308] but knew that Davis was in the hospital for "some overdose or ingesting something."[309]

There are also fact questions about whether Davis expressed a specific intention to engage in self-harm by swallowing batteries from his heart monitor.   Drake and Gassen maintain that Davis made no such comments and gave no signs of wanting to act on any self-harming thoughts.[310]   As previously noted, however, Davis claims he repeated his threat to swallow the batteries to Drake, with Gassen listening, and gave Gassen his suicide note written to Dr. Dante.   While Gassen does not recall receiving a letter from Davis to his psychologist,[311] Drake recalls receiving the letter.[312]   Drake also acknowledges checking the letter for contraband, briefly looking at it, and agreeing to

---

[307] (Dkt. # 191, Gassen Dep. at 5-6.)
[308] (Dkt. # 190, Drake Dep. at 31:11-13.)
[309] (Dkt. # 190, Drake Dep. at 41:9-42:7.)
[310] (Dkt. # 91, Drake Decl., ¶ 12; Dkt. # 92, Gassen Decl., ¶ 10.)
[311] (Dkt. # 191, Gassen Dep. at 17.)
[312] (Dkt. # 190, Drake Dep. at 48:22-49:19.)

forward it to Davis's treatment team.[313]  He claims that he did not, however, read the letter.[314] Drake did not recall whether Davis told him anything about what was in the letter or why he was writing to Dr. Dante.[315]  Drake reportedly did not notice anything about Davis's behavior that concerned him and described him as pleasant.[316]

Defendants point to an apparent inconsistency in his complaint and a notice of claim that he told two PCTs that he intended to attempt suicide by ingesting a battery. Drake and Gassen are correctional officers, and not PCTs.  Defendants contend that Davis's later averments about the letter or his remarks to Drake and Gassen concerning the batteries amount to a "sham" affidavit.[317]  Under the "sham affidavit rule," a party may not allege new facts that are in direct conflict with a previous sworn statement for the purpose of defeating a properly supported motion for summary judgment.  *See, e.g., Gates v. Caterpillar, Inc.*, 513 F .3d 680, 688 n. 5 (7th Cir. 2008) ("It is well established in this Circuit that, as a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of . . . the unmistakable need to clarify prior ambiguous statements." citations omitted)); *Ineichen v. Ameritech*, 410 F.3d 956, 963(7th Cir. 2005) ("parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their [prior sworn statements]. . . . If such contradictions were permitted . . . 'the very purpose of the summary judgment motion—to weed out unfounded claims, specious

---

[313]  (Dkt. # 190, Drake Dep. at 49:10-49:16.)
[314]  (Dkt. # 190, Drake Dep. at 50:09-50:12.)
[315]  (Dkt. # 190, Drake Dep. at 50:13-50:20.)
[316]  (Dkt. # 190, Drake Dep. at 54:3-14.)

denials, and sham defenses—would be severely undercut.'"). The pleadings that defendants point to, however, were prepared by Davis as a *pro se* litigant and are subject to a generous interpretation. Moreover, a failure to accurately identify the correct title of a speaker in a previous pleading is not so egregious or clear cut as to prevent a later correction. Although the inconsistencies between Davis's statements certainly make them appear more suspect, and are fodder for cross examination, the court declines to apply the sham affidavit rule here.

Based on this record, therefore, there are material fact issues about whether Drake and Gassen were aware of a serious risk to Davis's health or safety and failed to take reasonable measures to prevent harm during their shift. Ultimately, these fact issues preclude summary judgment on the claims against Drake and Gassen, which must be resolved by a trial. Accordingly, defendants' motion for summary judgment on the claims against Drake and Gassen must be denied.

### H. Self-Harm on May 2, 2012: Claims Against Priebe

Davis also contends that Priebe failed to take reasonable measures to prevent him from engaging in self-harm when he swallowed a razor blade while in an observation cell on May 2, 2012. It is undisputed that Davis told Priebe not to place him in the observation cell because there were razor blades in it. But the record also shows that Davis was strip-searched before being placed in the observation cell; Davis had not been

---

[317] (Dkt. # 236, Defendants' Reply Br. at 17-18.)

placed in that cell last; the cell had been previously searched; and the cell was again searched thoroughly by Priebe and another officer before Davis was placed there; and no razor blades were found.[318]   Moreover, without contradiction, Priebe describes the cell as "very small" and "Spartan," consisting of nothing more than "a cement bed and a toilet and a sink."[319]

If nothing else, the record here confirms that Priebe took Davis's comments seriously and thoroughly searched the observation cell, even though it had already been searched.   Although Davis disputes that the search was more than cursory, he offers no evidence permitting a reasonable jury to find that Priebe had a reason to know that there was any threat to Davis's safety in that cell.   Therefore, Davis does not demonstrate that Priebe knew of an obvious risk to his health or safety, but failed to take reasonable measures to prevent him from engaging in self-harm.   Under these circumstances, Priebe is also entitled to qualified immunity from Davis's claims.   Defendants' motion for summary judgment on the claims against Priebe will be granted.

### I.   Self-Harm on May 2, 2012: Claims Against Weiland

Davis next contends that Weiland failed to take reasonable measures to prevent him from engaging in self-harm after his return from the hospital on May 2, 2012.   While Davis does not disclose where he obtained the razor blade that he used to cut himself following his return from the hospital, he nevertheless contends Weiland acted with

---

[318] Priebe estimates that he spent five minutes conducting a thorough search of the cell, finding nothing.   (Dkt. # 196, Priebe Dep. at 29:24-25, 30:1-4.)   Weiland, who observed the search, estimated that it took eight to ten minutes.   (Dkt. # 199, Weiland Dep. at 12:15-17.)

deliberate indifference in placing him in observation cell 130 and in failing to increase the level of his supervision or place him in restraints.

The record shows that Weiland directed at least three individuals to search Davis's cell while he was at the hospital.   Although Weiland did not personally conduct a search, she had a right to rely on the "training and expertise" of the PCTs who performed the searches of Davis's cell and believed that it was safe.[320]   Although Davis had claimed there were razors in the cell, Weiland did not believe him after fruitless searches of the cell conducted while Davis was at the hospital.   Moreover, it is conceded (1) Weiland had no authority to increase the level of supervision or place Davis in restraints on her own; *and* (2) she promptly notified Dr. Dante upon Davis's return from the hospital to assess his level of supervision.   Although Davis was able to harm himself shortly after he was returned to cell 130, plaintiff offers no evidence that Weiland acted with deliberate indifference toward that risk.   As with defendant Priebe, Weiland ignored no obvious risk to Davis's safety by placing him in a cell she had no reason to believe to be unsafe.   Based on this record, Weiland is entitled to qualified immunity from Davis's claims against her.

## IV.   STATE LAW NEGLIGENCE

### A.  Superseding Cause

Defendants argue that Davis has no state-law claim for negligence because his injuries were self-inflicted.[321]   Under the theory of superseding cause, an individual

---

[319] (Dkt. # 196, Priebe Dep. at 23:17-21, 30:1-4.)
[320] (Dkt. # 199, Weiland Dep. at 20:2-25.)
[321] (Dkt. # 216, Defendants' Br. at 37-42.)

typically may not bring a negligence cause of action for acts of self-harm or suicide. *Taylor v. Wausau Underwriters Inc.*, 423 F. Supp. 2d 882, 899-901 (E.D. Wis. 2006).   As Davis notes, however, due to the custodial setting involved, and the duty imposed on prison officials to prevent harm, Wisconsin courts have recognized an exception to the superseding-cause limitation for negligence cases in the prison context.   *See Taylor*, 423 F. Supp. 2d at 899-901; *Estate of Hill v. Richards*, 525 F. Supp. 2d 1076, 1078-79 (W.D. Wis. 2007).   Applying this exception to the acts of self-harm inflicted by Davis, a state negligence claim is, at least, cognizable here.

### B.  Deficient Notices of Claim

Although Davis filed notices of claim for each of the claimed incidents of self-harm, defendants also argue that Davis's state-law negligence claims are precluded because he did not give proper notice with respect to each incident of harm in compliance with the requirements of Wisconsin's notice-of-claim statute, Wis. Stat. § 893.82.[322]   Specifically, defendants point out that Davis's notices neither the list the names of the individuals involved in the January 5 or May 2 incidents, nor state the time, date, location and circumstances with respect to the February 27-28 incident.

The purposes of the Wisconsin notice-of-claim statute are three-fold:  (a) provide the attorney general with adequate time to investigate claims that might result in judgments to be paid by the state; (b) provide the attorney general with an opportunity to effect a compromise without a civil action or civil proceeding; (c) place a limit on the

---

[322] (Dkt. # 216, Defendants' Br. at 42-46.)

amounts recoverable in civil actions or civil proceedings against any state officer, employee or agent.   Wis. Stat. § 893.82(1).   No claimant may bring an action against a state officer, employee or agent unless the claimant complies strictly with the requirements of this statute.   Wis. Stat. § 893.82(2m).   Indeed, the statute states that "no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's employee's or agent's duties . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved."   Wis. Stat. § 893.82(3).

In April 2012, Davis submitted a notice of claim stating that he was injured on January 5, 2012, at 9:00 a.m., when unidentified staff "failed to reasonably respond" to his threat to commit suicide.[323]   Referencing the May 2 incident, Davis also submitted a notice of claim stating that he was injured on "May 1, 2012," when unidentified staff placed him in an observation cell after he informed them that there were razors in it.[324]

---

[323] (Dkt. # 96, Kruse Decl., Exh. A.) ("I submitted requests to staff (1/2) stating that I'd be killing myself on January 8th.   On January 5, 2012, I swallowed a key, fingernail clipper, and corrosive cleaning chemical in a suicide attempt.   That morning I informed 5 staff of my intentions and they all failed to reasonably respond.")

[324] (Dkt. # 96, Kruse Decl., Exh. C.) ("I was placed in an observation cell which I informed staff that it had razors in.   I told all staff but don't know all their names they are in the lawsuit I think (12-cv-559-wmc, claim three).   They placed me in the cell.   I swallowed ½ of a razor.   I then was taken to the hospital.   Upon return to the institution (after issuing suicide threats) I once

Davis concedes that these notices do not list any individual by name as required by Wis. Stat. § 892.82(3).[325]   As such, the notices are defective.   *See, e.g., Modica v. Verhulst*, 195 Wis. 2d 633, 647, 536 N.W.2d 466 (Ct. App. 1995) (a notice of claim which did not identify the allegedly negligent technician by name did not comply with requirements of statute); *Williams v. Lamb*, 07-CV-01158, 2011 WL 4452845, *4 (E.D. Wis. Sept. 26, 2011) (references to unnamed "c/o" or correctional officer is insufficient to satisfy the notice requirement found in Wis. Stat. § 893.82).   Accordingly, Davis is precluded by Wis. Stat. § 893.82 from bringing a negligence claim regarding these incidents.

Davis's other notice of claim, which is directed toward incidents that occurred on February 27-28, 2012, lists only four names:

> Let staff know of my intentions to kill myself multiple occasions.   They failed to respond.   I then told supervisors and filed complaints stating that staff were not monitoring inmates ingesting Tylenol & aspirin – I overdosed, swallowed a key and a pen and a rock.   I had to have surgery and endure pain.
>
> Additionally, staff dropped the "observation of suicide" status while I was at the hospital to reduce cost and eliminate the need for a supervisor at the hospital.   I was then denied the request for psych staff.   I again attempted suicide by ingesting an alkaline battery.   I told two PCTs that I'd be doing it [*sic*] involved persons, Cindy Harding, Derek Stoinski, C.O. Drake, Doris Dehn, and many others.[326]

Defendants note that this notice does not list the following individuals:   Miller, Rutherford, Rockow, Lemke, Barker, Stern, Robl, Kaufmann or Gassen.   To the extent that this notice has listed Harding, Stoinski, Dehn, and Drake, defendants note moreover,

---

again told them there were still razors in the cell.   I cut myself open & swallowed a razor.   Severe throat, stomach, back, anal pain. Unable to eat. Weight loss.")
[325] (Dkt. # 96, Kruse Decl., Exh. A & C.)

Davis failed to include a time of day or provide an accurate date on which those named defendants were supposedly negligent as required by Wis. Stat. § 892.82(3).   For example, Davis alleges in this case that Drake was negligent on March 1, but not on February 27-28.   Likewise, the notice fails to identify any negligence on the part of Harding, Stoinski or Dehn occurring on February 27-28.   These allegations, too, are insufficient to comply with Wis. Stat. §  893.82.

Wisconsin's notice-of-claim statute must be strictly followed.   *See Kellner v. Christian*, 197 Wis. 2d 183, 195, 539 N.W.2d 685 (1995).   Substantial compliance is not enough.   *Id*.   As such, Davis's notices of claim fail to satisfy Wis. Stat. §  893.82 with respect to any of the defendants.

Alternatively, plaintiff argues that defendants are estopped from arguing that Davis's notices of claim were deficient because he (1) prepared them with assistance from a WRC librarian, and (2) had a WRC attorney review the notices before he filed them. This argument goes nowhere.   First, Wisconsin courts have rejected the doctrine of estoppel despite the admittedly harsh consequences that follow for failing to comply with the technical requirements of the notice-of-claim statute.   *See J.F. Ahern Co. v. Wisconsin State Bldg. Comm'n*, 114 Wis. 2d 69, 83, 336 N.W.2d 679, 686, (Ct. App. 1983) ("No basis exists for the equitable doctrine of estoppel. The statute must be enforced even though it produces "harsh consequences.") (citing *Mannino v. Davenport*, 99 Wis. 2d 602, 615, 299 N.W.2d 823 (1981); *Oney v. Schrauth*, 197 Wis. 2d 891, 904, 541 N.W.2d 229,

---

[326] (Dkt. # 96, Kruse Decl., Exh. B.)

233, 1995 WL 625946 (Ct. App. 1995) (holding that Wis. Stat. § 893.82's "requirements cannot be waived and no basis exists for the equitable doctrine of estoppel"); *Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 116, 595 N.W.2d 392 (1999) (noting that failure to comply with the requirements of Wis. Stat. § 893.82 is fatal to any claim because its requirements are jurisdictional).

Second, even assuming Davis could assert an estoppel claim based on his reliance on erroneous advice, Davis's failure to comply with the notice-of-claim statute could not be excused. *See Oney*, 197 Wis. 2d at 904-05 (rejecting an argument based on estoppel where the plaintiff reportedly relied on the attorney general's office to inform him whether his notice was untimely). Notwithstanding what he was or was not told, the pre-printed notice-of-claim form used by Davis in this case expressly asks for basic information such as date, time and the name of the officer or official involved, which should have prompted Davis to supply this information. Moreover, allowing Davis to proceed based on supposed conversations with government officials would, at best, reintroduce uncertainty the statute was meant to avoid, and at worst, invite a trial within a trial, defeating the whole purpose of the notice-of-claim statute. Because the notices of claim that Davis filed are deficient for purposes of Wis. Stat. § 893.82, defendants' motion for summary judgment on Davis's negligence claims will be granted.

V.    MEDICAL MALPRACTICE

Claims of medical negligence or malpractice are exempt from the notice requirement found in Wis. Stat. § 893.82.   To the extent that any of Davis's negligence claims might be construed as medical malpractice claims, however, defendants argue that Davis fails to offer proof that any of the named defendants failed to meet the applicable standard of care.[327]

Under Wisconsin law, medical negligence is the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149 (1999); *Sheahan v. Suliene*, 12-cv-433-bbc, 2014 WL 1233700, *9 (W.D. Wis. Mar. 25, 2014).   A claim for medical malpractice requires proof that a health care provider breached a duty that resulted in injury or damages.   *Paul v. Skemp*, 2001 WI 42, ¶17, 242 Wis. 2d 507, 625 N.W.2d 860. Medical malpractice lawsuits require expert testimony to establish the standard of care. *Carney-Hayes v. Northwest Wisconsin Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524.

While Davis does not identify a particular defendant against whom he has a medical malpractice claim, Davis's claim for medical malpractice is presumably against Dr. Rutherford for the incident of self-harm that occurred on January 5, 2012, as she was the psychologist responsible for Davis's overall mental health treatment at WRC.   Indeed, Davis presents an expert report from Dr. Teresa Woods, who notes that the DOC has a

---

[327] (Dkt. # 216, Defendants' Br. at 47-51.)

policy and set of procedures for preventing suicide in its adult correctional institutions.[328] Dr. Woods specifically cites to the policy and procedures governing levels of supervision for "close" and "constant" observation:

1. Close Observation

   a. Inmates who are believed to be at significant risk for self-harm may be placed on close observation.  This may include inmates who express suicidal thoughts or feelings, or have a recent history of suicidal or self-harm behavior.

   b. Correctional Officers shall observe the activities of an inmate in close observation at staggered intervals not to exceed 15 minutes. . . .

2. Constant Observation

   a. Inmates who are considered at high risk for imminent suicidal behavior require constant observation.

   b. Constant observation involves continuous line-of-sight monitoring by Correctional Officers whose task is dedicated to monitoring.  Observations shall be summarized . . . at intervals not to exceed 15 minutes.[329]

Dr. Woods further opines that the standard of care dictated by this policy was not followed on January 5, 2012, when Davis submitted a PSR expressing suicidal thoughts. In particular, Woods criticizes Rutherford for failing to conduct an "adequate assessment, as required by general sound judgment and DAI protocol specifically, was not immediate[ly] provided."[330]

Defendants maintain that the policy identified by Dr. Woods applies to correctional institutions, but not to WRC.  Dr. Rutherford indicated in her deposition,

---

[328] (Dkt. # 188, Report of Dr. Teresa Woods.)
[329] (Dkt. # 188, Report of Dr. Teresa Woods, at 11.)

72

however, that the policy identified by Dr. Woods was applicable at WRC and that she typically followed this policy when assessing an inmate's risk of self-harm or suicide.[331] For the reasons discussed above in connection with Davis's Eighth Amendment deliberate-indifference claim, this appears to raise a fact issue as to whether Dr. Rutherford failed to comply with the standard of care outlined in the policy on suicide prevention on January 5, 2012.   Accordingly, Davis's allegation that Dr. Rutherford committed medical malpractice on January 5 will be determined at trial and defendants' motion for summary judgment on this claim will be denied.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (Dkt. # 214) is DENIED with respect to the following claims:  (a) whether Derek Stoinski acted with deliberate indifference on January 5, 2012, by failing to take reasonable measures to prevent Davis from engaging in self-harm; (b) whether Cindy Harding acted with deliberate indifference on or about February 23, 2012, by failing to take reasonable measures to prevent Davis from stockpiling over-the-counter medication; (c) whether Michael Drake and Anthony Gassen acted with deliberate indifference from on or about February 29 through March 1, 2012, by failing to take reasonable measures to prevent

---

[330] (Dkt. # 188, Report of Dr. Teresa Woods, at 11.)
[331] (Dkt. # 220, Rutherford Dep. at 31:2-34:25.)

73

Davis from engaging in self-harm; and (d) whether Dr. Jasmine Rutherford committed medical malpractice on January 5, 2012, by failing to assess Davis's risk of self-harm or suicide under the DOC suicide prevention policy.

2. Defendants' motion for summary judgment (Dkt. # 214) is GRANTED with respect to all other claims and defendants.

Entered this 3rd day of October, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge